

**Timothy C. Parlatore, Esq.**
Managing Partner
timothy.parlatore@parlatorelawgroup.com
Direct:212-679-6312

March 12, 2023

Darcie N. McElwee
U.S. Attorney, District of Maine
100 Middle St., 6th Floor East
Portland, ME 04101

    *Re: United States v. Lucas Sirois, 1:21-cr-00175-LEW*

Dear Ms. McElwee:

    I represent Lucas Sirois in the above referenced matter and am writing to ensure that you are aware of a conflict of interest involving AUSA Noah Falk which we believe necessitates his disqualification and which may extend to other members of your office. Specifically, we believe that the Rohrabacher-Farr Amendment's funding restrictions were violated repeatedly by your office, and specifically by AUSA Falk, during the course of this investigation and prosecution. Any finding to that effect by the Court in the upcoming Rohrabacher-Farr hearing will necessarily trigger several provisions of the Anti-Deficiency Act and subject AUSA Falk to mandatory disciplinary action and potentially to criminal prosecution. Moreover, your office will be subject to a mandatory investigation which must be reported by the Attorney General to the President and to Congress. Given the danger and seriousness of these mandatory consequences, particularly for AUSA Falk, he has become an "interested party" and must be disqualified. We further believe that, given the potential reach of this conflict of interest, as well as the potential for a mandatory report by the Attorney General on funds unlawfully expended by your office, the U.S. Attorney's Office for the District of Maine should be recused from this matter and a special counsel assigned by the General Counsel's Office.

    I am writing to you first, rather than filing a motion with the Court, to give you the opportunity to consider and resolve the matter without the need for any motion practice. I am aware that the majority of these unlawful expenditures happened prior to your appointment as U.S. Attorney and that the criminal complaint in this matter was filed only two weeks after your confirmation. Moreover, given that I put AUSA Falk on notice that this matter was being pursued in violation of Rohrabacher-Farr prior to the complaint being filed, yet he proceeded with the filing, it would not surprise me if this fact was not disclosed to you or other supervisory members of the office at that time.

Licensed to Practice by the States of New York and New Jersey
U.S. District Courts in New York, New Jersey, Connecticut, Pennsylvania, Texas, and the District of Columbia
Parlatore Law Group is a nationwide cloud-based law firm. Please send all correspondence electronically.
In the event that physical mail is required please use the central mailing address below.
www.parlatorelawgroup.com         One World Trade Center, Suite 8500, New York, NY 10007

## BACKGROUND

Since at least 2015, the Department of Justice, and in particular AUSA Falk, has routinely ignored the clear evidence of lawful conduct on the part of Lucas Sirois, his business associates, and various entities involved in Maine's medical marijuana program, in favor of unlawfully launching an investigation and prosecution. These actions were taken in violation of Rohrabacher-Farr, which restricts DOJ's funding in the realm of state-regulated and legalized medical marijuana. This case has been marred by police misconduct and indiscretion since around 2010. The Maine Drug Enforcement Agency (MDEA), in coordination with the Drug Enforcement Agency and the US Attorney's office in Maine, has been attempting to develop a theory of drug trafficking by Mr. Sirois and those around him since that early date. In 2010, Trooper Matthew Casavant obtained a search warrant based on speculative information, warrantless searches, and information from cooperating informants. This process is similar to the investigative steps seen in the discovery documents for this case. However, the 2010 search warrant did not result in charges and instead showed that Mr. Sirois was licensed by the state to run a medical marijuana operation. This information was publicly available and should have been obtained prior to presenting a misguided theory of probable cause to the court. These missteps highlight the ongoing misconduct in this case. More importantly, the events in 2010 put the MDEA, DEA and US Attorney's Office on notice that their target, Mr. Sirois, was in fact licensed by the state of Maine to conduct marijuana operations.

Upon reviewing the discovery and other relevant documents, it has become evident that MDEA agent Casavant held onto his belief that Mr. Sirois was involved in criminal activities and continued to investigate him for years despite a wealth of evidence to the contrary. This investigation continued even after the Rohrabacher-Farr amendment was passed in 2015, which expressly prohibited such expenditures. Years after the passage of Rohrabacher-Farr, Casavant, in coordination with DEA Special Agent Harry Tideswell and with the support of DOJ personnel, expanded his theory to include a primary conspiracy allegation based on the activities of co-defendant Ryan Nezol. In September 2018, the Portland Maine Resident Office (PMERO) initiated an investigation called Sunday River, which targeted a large-scale marijuana Drug Trafficking Organization (DTO) under the direction of Lucas Sirois of Rangeley, Maine. (SEAR-2020-05319 for Case CE-18-0041).

AUSA Falk, who joined the Portland Maine United States Attorney's office in 2019, became pivotal to the government's continued unlawful expenditures, using Nezol's "intercepts to spin off onto SIROIS and his own line," according to an internal email regarding Mr. Sirois' case. In 2020, AUSA Falk obtained a warrant for wiretaps on Mr. Sirois' phone and those related to his business. The government's reasoning for extending wiretaps to reach Mr. Sirois was based on the fact that there was direct contact between Mr. Sirois and Mr. Nezol, which they learned through a previous warrant for wiretap on Mr. Nezol. However, AUSA Falk failed to consider the crucial fact that both men were licensed caregivers under Maine law, and discussions related to regulated marijuana within the context of operating a licensed medical marijuana operation could not give rise to probable cause. The ongoing violation of Rohrabacher-Farr is revealed by the affidavits

in support of the wiretap application, which demonstrate the extensive amount of government spending for the investigation up to that point. In AUSA Falk's motion, it states that, "[a]ll traditional avenues of the investigation have been carefully evaluated for use by all principal agencies involved in this investigation or have been attempted with limited results. The traditional investigative techniques used thus far have included the identification and debriefing of sources of information, the use of pen registers, the issuance of administrative subpoenas, toll analysis, controlled purchases of marijuana, the execution of search warrants for stored electronic communications, installation of a pole camera, and surveillance" (AFFIDAVIT IN SUPPORT OF APPLICATION FOR AUTHORIZATION TO INTERCEPT WIRE AND ELECTRONIC COMMUNICATIONS pg. 44).

The record also clearly shows that the Department of Justice – and in particular AUSA Falk – completely ignored the implications of Rohrabacher-Farr throughout its investigation. The only mention of the amendment throughout the discovery was in a footnote in the Authorization in Support of Application for Authorization to Intercept Wire and Electronic Communications in which AUSA Falk baldly asserted that Rohrabacher-Farr was not being violated. DOJ viewed the "Nezol-Sirois conspiracy" as the basis for further investigation, despite it being completely baseless. The discovery record at the time of the warrant request reveals that the conspiracy could not be supported by the evidence then available to the government. [1]Despite this, the government maintained its position that the conspiracy existed. AUSA Falk's motion, stated that, "the Conspiracy is operating outside of the bounds of Maine's medical marijuana program in numerous respects. First and foremost, members of the Conspiracy traffic in both marijuana and cocaine, which takes the Conspiracy's activities far outside of Maine's marijuana laws," Despite abundant evidence to the contrary and in direct violation of the Rohrabacher-Farr funding restrictions. (AFFIDAVIT IN SUPPORT OF APPLICATION FOR AUTHORIZATION TO INTERCEPT WIRE AND ELECTRONIC COMMUNICATIONS pg. 15 emphases added).

When our firm was retained by Mr. Sirois prior to the government filing its complaint and subsequent indictment against our client, we sought out a line of direct communication with AUSA Falk to implore him to consider the application of Rohrabacher-Farr. We offered to discuss the case with him and to shed light on the fact that his primary theory of criminality was wholly inaccurate. To our dismay, Mr. Falk routinely rejected our efforts and went so far as to tell us that he knew everything he needed to about this case already and would not be served by new information we may be able to provide. Of course, the fact that nearly a year and a half later Mr. Falk was learning new exculpatory information from his primary agent on the case that the DEA had incentivized an essential witness with "up to 25 percent or up to $500,000 of amounts realized by the government," exemplifies the fact that Mr. Falk did not know everything he needed to know in order to make a well informed decision to expend funds in direct violation of Rohrabacher-Farr. Unfortunately, Mr. Falk has repeatedly chosen to see only what he wanted to see and ignored all of the documentary evidence amassed by the

---

[1] In fact, a 2022 proffer session conducted with Mr. Nezol later definitively ended any possibility of belief that he had been conspiring with Mr. Sirois at the time of the warrant application or at any other time.

expenditure of unauthorized funds informing him that he was wrong. Each new revelation of exculpatory information merely serves to highlight the egregious misuse of funds throughout this investigation and prosecution.

The question of just how much the investigation has cost the DOJ since 2015 is obviously a material one. From the first dollar spent, the DOJ was beholden to the Rohrabacher-Farr amendment that prohibited it from spending even one dollar without something clearly pointing to non-compliance with state law. With an investigation that has involved hundreds of agents, thousands of man-hours, tremendous amounts of data, and multiple years of work, the potentially millions of dollars in expenditures would surely have brought about something concrete to charge our client with if he had actually been in violation of Maine's medical marijuana laws.  Instead, it is becoming more and more clear every day that the government is losing credibility with its theory instead of gaining any traction, to the extent that the initial "conspiracy" has been abandoned. AUSA Falk's persistent, knowing, and willful violation of Rohrabacher-Farr has placed him and the staff of your office in the unusual position of a true conflict of interest; his own conduct is effectively facing judicial review and very real specter of administrative or penal sanctions.

## APPLICABLE LAW

### 1. The Anti-Deficiency Act

The Anti-Deficiency Act prohibits federal employees from making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law (31 U.S.C. § 1341(a)(1)(A)). It also prohibits involving the government in any obligation to pay money before funds have been appropriated for that purpose, unless otherwise allowed by law (31 U.S.C. § 1341(a)(1)(B)). The Act further prohibits accepting voluntary services for the United States, or employing personal services not authorized by law, except in cases of emergency involving the safety of human life or the protection of property (31 U.S.C. § 1342). Additionally, it prohibits making obligations or expenditures in excess of an apportionment or reapportionment, or in excess of the amount permitted by agency regulations (31 U.S.C. § 1517(a)).

Federal employees who violate the Anti-Deficiency Act are subject to two types of sanctions: administrative and penal. Employees may be subject to appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office. In addition, if the violations are knowing and willful, employees are subject to criminal prosecution, fines, and up to two-years imprisonment (31 U.S. Code § 1349).  Punitive administrative actions against individual employees are the most common result of Anti-Deficiency Act violations.

Once it is determined that there has been a violation of 31 U.S.C. §§ 1341(a), 1342, or 1517(a), the agency head "*shall* report immediately to the President and Congress all relevant facts and a statement of actions taken." 31 U.S.C. §§ 1351, 1517(b). In addition, the heads of executive branch agencies and the Mayor of the District of Columbia shall

also transmit "[a] copy of each report . . . to the Comptroller General on the same date the report is transmitted to the President and Congress." 31 U.S.C. §§ 1351, 1517(b), as amended by the Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, div. G, title II, § 1401, 118 Stat. 2809, 3192 (Dec. 8, 2004). Accordingly, violations of the Act have significance for the entire agency involved.

## 2. *Conflicts, Recusal, and Appointment of Special Counsel*

When United States Attorneys, or their offices, become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of an actual or apparent conflict of interest, they must contact EOUSA's General Counsel's Office (GCO). U.S. Government Accountability Office, Appropriations Law Resources, https://www.gao.gov/legal/appropriations-law/resources (last visited Mar. 13, 2023). United States Attorneys cannot recuse themselves or their offices from cases or matters. They must be recused by the designated Associate Deputy Attorney General. The requirement of recusal does not arise in every instance, but only where a conflict of interest exists or there is an appearance of a loss of impartiality, such as where a number of employees face the probability of sanctions based on their conduct.

A United States Attorney who becomes aware of circumstances that might necessitate his or her recusal or that of the entire office should promptly notify GCO to discuss whether a recusal is required. If recusal is appropriate, GCO will coordinate the recusal action, obtain necessary approvals for the recusal, and arrange for a transfer of responsibility to another office. See 3-1.140 United States Attorney Recusals, USAM § 3-1.140 (2018)

While there is little precedent for recusal of an entire office in the First Circuit, the Ninth Circuit has provided an outline of the appropriate procedures for handling conflicts issues such as the one described within this letter:

> The General Counsel's Office of the Executive Office for United States Attorneys (EOUSA) coordinates office-wide recusals, obtains necessary approvals, and helps arrange the transfer of responsibility to another office, including any designations of attorneys as a Special Attorney or Special Assistant to the Attorney General (U.S. Atty's Manual § 3-2.300) pursuant to 28 U.S.C.S. § 515. U.S. Atty's Manual § 3-2.170. When an entire office is recused, the Attorney General may, pursuant to 28 U.S.C.S. § 515, appoint any officer of the Department of Justice (DOJ), or any attorney specially appointed under law, to conduct any kind of legal proceeding which United States Attorneys are authorized by law to conduct, whether or not such appointee is a resident of the district in which the proceeding is brought. Said appointee specially retained under authority of the DOJ is appointed as a Special Assistant or a Special Attorney to the Attorney General and reports directly to the Attorney General or delegee. Such appointments are executed by the EOUSA. U.S. Atty's Manual § 3-2.300. The manual thus suggests that DOJ approaches office-wide recusals, and the need to appoint an acting United States Attorney from outside the local United States Attorney's office, through the framework of 28 U.S.C.S. § 515(a). *United States v. Weyhrauch*, 544 F.3d 969, 970 (9th Cir. 2008).

Although not binding, the Ninth Circuit's decision provides useful guidance regarding the next steps to be followed here. The DOJ has recently undertaken this process with another US Attorney's office in Massachusetts.[2]

## DISCUSSION

The sole issue to be decided at the upcoming Rohrabacher-Farr hearing is whether this investigation and prosecution are and have been spending money in violation of Congressionally imposed prohibitions on the use of appropriated funds. Notwithstanding the objections filed by your Office, the Court clearly intends to examine this unlawful expenditure at each stage of the investigative process. Thus, *any* finding by the Court that funds were unlawfully expended will trigger the automatic provisions of the Anti-Deficiency Act. In that event, the following mandatory events must occur:

1. Attorney General Garland "shall report immediately to the President and Congress all relevant facts and a statement of actions taken." 31 U.S.C.S. § 1351
2. AUSA Falk, and potentially others,[3] "shall be subject to appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office."31 U.S.C.S. § 1349

In addition to the above, a criminal investigation must be commenced into AUSA Falk and others for possible violations of 31 U.S.C.S. § 1350. As the violation will have already been established through the Rohrabacher-Farr ruling, this criminal investigation will focus solely on whether AUSA Falk's violation was done "knowingly and willfully." Obviously, the most damning evidence against AUSA Falk will be the letter that I sent him on October 8, 2021, in which he was fully and explicitly informed that this prosecution was already barred by congressional funding restrictions.[4] As this investigation will have to be conducted either by the Office of Professional Responsibility or a Special Counsel, discretion on whether to prosecute AUSA Falk for his potentially criminal activity will be outside of your office's purview.

In his most recent filing, last night, AUSA Falk made a stunning admission, not only of his disregard of the clear and unambiguous prohibitions, but also indicating his intent to continue to willfully violate the law:

> If the Appropriations Rider prevented the government from investigating Maine caregivers simply because they were registered and facially compliant, it would lead to absurd results... But before a noncompliant caregiver can be prosecuted, there must be an investigation.

---

[2] https://www.bostonherald.com/2022/09/11/rachael-rollins-recused-as-feds-eye-suffolk-da-kevin-hayden-in-mbta-transit-police-case/

[3] It is unknown how many others may be implicated in this at a disciplinary level, either within your office or in another agency under DOJ's umbrella, such as the DEA.

[4] A copy of this letter is annexed hereto at Exhibit "A."

This statement flies in the face of the clear congressional mandate that DOJ must stay out of the regulation of state medical marijuana and leave any such enforcement to the states. To put a finer point on it: **if a Maine caregiver is registered and facially compliant, then it is unlawful to expend DOJ funding to investigate them**. That function is reserved only to regulators working for the state.[5] Yet, despite numerous warnings and even a fully briefed motion on the issue with a hearing scheduled, AUSA Falk is unflinching in his admission, not only in his lack of remorse for his past violations,but also his intent to continue violating the Anti-Deficiency Act and unlawfully expend funds in additional cases.

In light of the undeniable fact that any violation of Rohrabacher-Farr in this case would necessarily trigger sanctions under the Anti-Deficiency Act, AUSA Falk does indeed have a true conflict regarding his impartiality. As the drafters of the Rohrabacher-Farr amendment made clear in their letter to then-Inspector General for the Department of Justice, Michael Horowitz, "these expenditures violate both the Anti-Deficiency Act and the Rohrabacher Farr provision of the Consolidated and Further Continuing Appropriations Act of 2015 (PL 113-235) Sec. 538.[6] . The point raised by the drafters should trigger an urgent evaluation by the U.S. Attorney's office in Maine as to whether or not it has become conflicted in the present matter and to immediately take the necessary steps to remedy the issue.

## CONCLUSION

AUSA Falk may not personally agree with the legalization of medical marijuana or the fact that Congress forbid DOJ from interfering with Maine's implementation of those policies. However, his personal beliefs do not grant him license to ignore the law and expend DOJ funds in a manner prohibited by Congress in the hopes that he may uncover some form of non-compliance that would justify his illegal actions. His decision to do so put him in both disciplinary and criminal peril and has significant additional implications for your office.

For all the forgoing reasons, AUSA Falk and the U.S. Attorney's Office for the District of Maine cannot continue to represent the United States of America in the Rohrabacher-Farr hearing of this matter without violating the Due Process clause of the 5th Amendment. Absent an immediate dismissal or Deferred Prosecution Agreement, both AUSA Falk and the U.S. Attorney's Office for the District of Maine must be recused or disqualified, and a Special Counsel appointed prior to the hearing date.

---

[5] This passage also underscores the fact that, in fairness to AUSA Falk, he must be removed from this case and be afforded the opportunity to consult with counsel before he makes any additional admissions of criminal intent. Thus, his continued representation of the United States and appearance before the Court may have additional 5th Amendment implications for himself.

[6] A copy of this letter is annexed hereto at Exhibit "B".

Very truly yours,

Timothy C. Parlatore, Esq.

CC:    All other Defense Counsel

# Exhibit A



**Timothy C. Parlatore, Esq.**
Managing Partner
timothy.parlatore@parlatorelawgroup.com
Direct:212-679-6312

October 8, 2021

AUSA Noah Falk
U.S. Attorney's Office, District of Maine
100 Middle Street
Portland, Maine 04107

      *Re: United States v. Sirois*

AUSA Falk:

      I am writing to follow up on our phone discussion on September 24, 2021. Although you refused to give us any detail about what the basis of any potential charges would be, you did state that one of the major issues is that our client is not conducting his cannabis business in accordance with Maine law. This statement stuck out in stark contrast to our understanding of Mr. Sirois' business practices, and I therefore felt it worthwhile to follow up with you on this issue.

### Rohrabacher-Farr Amendment

      As you are undoubtedly aware, the "Rohrabacher-Farr Amendment," which has been included in every federal appropriations bill since 2014 mandates that:

> None of the funds made available in this Act to the Department of Justice may be used, with respect to the State[] of ...Maine... to prevent such State[] from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

      In a sign of the increasing acceptance among senior government officials, earlier this year, President Biden became the first President to include this amendment as part of his proposed budget. This amendment was most recently renewed last week as part of the stopgap.

      Courts have applied this amendment to criminal cases by holding that "[w]hen Congress has enacted a legislative restriction like § 542 that expressly prohibits DOJ from spending funds on certain actions, federal criminal defendants may seek to enjoin the expenditure of those funds." *United States v. McIntosh*, 833 F.3d 1163, 1172-73 (9th Cir. 2016). In *United States v. Daniels*, 435 F. Supp. 3d 214 (D. Me. 2019), this District followed the 9th Circuit holding by holding an evidentiary hearing on whether the

Licensed to Practice by the States of New York and New Jersey
U.S. District Courts in New York, New Jersey, Connecticut, Pennsylvania, Texas, and the District of Columbia
Parlatore Law Group is a nationwide cloud-based law firm. Please send all correspondence electronically.
In the event that physical mail is required please use the central mailing address below.
www.parlatorelawgroup.com    One World Trade Center, Suite 8500, New York, NY 10007

Defendants were in strict compliance with Maine law, necessitating an injunction against prosecution.

Although the Defendants in *Daniels* were unable to meet their burden of proving compliance by a preponderance of the evidence, the circumstances of our client's business demonstrate that they are in compliance. As I stated on the phone, my preference is the resolve this issue with you before any arrest or press release is issued, which will serve no legitimate purpose other than to damage my client's business prospects before a judge issues an injunction against further prosecution.

To assist the Government in avoiding an unwarranted arrest, we have prepared a brief outline of how Mr. Sirois has consistently complied with state law following all requirements put forth by the Maine Office of Marijuana Policy (OMP).

**Mr. Sirois is a licensed "Caregiver" in Maine**

Under Maine law,[1] "a caregiver, for the purpose of assisting a qualifying patient with the patient's medical use of marijuana, may engage in the following authorized conduct if the caregiver is a resident of the State, is 21 years of age or older and has not been convicted of a disqualifying drug offense"

Mr. Sirois was first issued his caregiver license in 2010. Mr. Sirois has subsequently been revaluated and relicensed annually since then with his current license to operate as a state sanctioned caregiver being awarded on March 22, 2021, well after the commencement of your investigation. From 2010 until now, Mr. Sirois has operated under strict compliance of Maine law and has only ever sold medical marijuana to Maine patients, Maine caregivers, or licensed Maine dispensaries. At no time did Mr. Sirois sell or distribute marijuana across state lines.

The controlling law in Maine medical marijuana sales has been amended many times since Mr. Sirois first entered the market, as each time the law shifted towards a less restrictive market. As the law changed Mr. Sirois' businesses scaled up to meet the new allowable limits for production and wholesale. With each change, Mr. Sirois' businesses maintained strict compliance and the record will show that Mr. Sirois was a primary voice getting the regulators to explain certain aspects of the law that required clarity. In fact, on multiple occasions Mr. Sirois lobbied for a more comprehensive compliance program for the state under what is known as the track and trace program. Mr. Sirois even once invited state inspectors to come to his facilities monthly to ensure that he was a compliant and fully transparent business.

---

[1] See, §2423-A. Authorized conduct for the medical use of marijuana; subsection 3, paragraph C. https://www.maine.gov/dafs/omp/medical-use/applications-forms/caregiver-instructions

## Three Year Look Back at Compliance Under Maine's Medical Marijuana Law

Over the past three years there have been numerous amendments to Maine's medical marijuana regime with each amendment making the law more flexible and liberal in its application. Prior to the July 2018 amendment, LD 1539, a caregiver was permitted to cultivate up to six mature marijuana plants per patient; possess up to 2.5 ounces of prepared marijuana per patient and an unlimited amount of "incidental" marijuana; assisting a maximum of five patients. Caregivers are required to (1) Keep a record of all transfers of marijuana plants and harvested marijuana; (2) Keep the books and records maintained by the registered caregiver, registered dispensary, marijuana testing facility or manufacturing facility for a period of 7 years; (3) Complete an annual audit of business transactions of the registered caregiver, registered dispensary, marijuana testing facility or manufacturing facility by an independent 3rd party; and  (4) Make the books and records maintained under this subsection available to inspection by the department upon the department's demand.

### Pre-2018 Amendments

Mr. Sirois maintains, and the evidentiary record will show that prior to the 2018 and subsequent year amendments that strict compliance was always adhered to under his caregiver license and in his capacity as a landlord, and cannabis consultant. Mr. Sirois' businesses consistently filed monthly sales taxes and filed all taxes required under state and federal law annually. The cannabis business transactions were available for inspection at any time by the state and were always maintained in hard copy and eventually electronically. Trip tickets, sales receipts, plant counts for mature plants, immature plants, and incidental plant material as well as all prepared or processed marijuana product. As a caregiver, Mr. Sirois maintained all registration paperwork and patient designation cards as required under the law at that time.

### 2018 Amendment

Beginning in December 2018, Maine's law underwent major change as the state sought to remedy gaps in the law regarding excess cannabis that cultivation produces. Importantly, the law permitted caregivers to serve patients without completing a patient designation form or taking the patient designation card, because patients were no longer required to designate a caregiver. Additionally, cultivation was increased to allow to up to 30 flowering and 60 vegetative plants, regardless of how many patients the caregiver served. Most importantly, LD 1539 designed a new wholesale program that allowed for caregivers to receive compensation for any excess medical cannabis donated to other caregivers.  Under LD 1539, caregivers were able to sell or donate up to 30% of the mature cannabis plants the caregiver grew in a calendar year, including any harvested cannabis, cannabis products, or concentrates manufactured from that 30%.

In response to the newly modified law, Mr. Sirois met with his legal counsel for compliance and devised operational plans to allow for lawful business growth. With his legal team, Mr. Sirois developed a new compliance checklist to ensure adherence to all

3

relevant laws and regulations. Moreover, Mr. Sirois' facilities and standard operating procedures were regularly discussed by Maine's various cannabis related legislative committees who were drafting proposed bill language. Mr. Sirois' thoughts were often asked for from leadership at OMP as the two sides worked together with multiple groups to help advance Maine's medical marijuana industry. Once the new changes came out, Mr. Sirois held multiple meetings between various caregivers and dispensaries to establish procedures for increased sales and in particular the new wholesale arrangements. Mr. Sirois has for a long time been asked to play an important role in helping to bridge understandings between regulators and licensees when changes to the law came about. For his own compliance, all new sales were properly accounted for and documented in transactions ledger.

## 2019 Amendment

Following up on the 2018 changes, Maine further expanded the medical marijuana market with its 2019 amendment allowing for even more cultivation, production and sales by caregivers. The efforts of the state reflect the evolving nature of cannabis as an industry and the need for treating it like a normal business with less restrictions over time. Major changes to the law captured in LD 1738 included increasing the percentage of marijuana allowed to be sold from 30% to 75% of the mature marijuana plants grown by the caregiver over the course of a calendar year, including any marijuana products or marijuana concentrate manufactured from that 75% of the mature marijuana plants grown by the caregiver. Further, a registered caregiver was allowed to "transfer to or accept from other registered caregivers and dispensaries in wholesale transactions an unlimited amount of immature marijuana plants and seedlings."

The most important language added to the law is found in Sec. 2. 22 MRSA §2423-A, sub-§2, ¶K-1, "A registered caregiver that acquires mature marijuana plants, marijuana products or marijuana concentrate in a wholesale transaction under this paragraph may not resell the mature marijuana plants, marijuana products or marijuana concentrate **except to a qualifying patient or to another registered caregiver or dispensary to assist a qualifying patient** (emphasis added).

Once again, Mr. Sirois' businesses scaled up to the allowable limits under the law and maintained all required documents and paperwork under the licensing program.

## 2019 On-site Inspection

As part of Maine's medical marijuana compliance program, the Maine Office of Marijuana Policy is responsible for conducting random on-site inspections of caregiver cannabis facilities[2]. The department may suspend, revoke or refuse to renew the registration identification card or registration certificate of a registered caregiver, a registered dispensary, a marijuana testing facility or a manufacturing facility that refuses or willfully avoids 2 or more inspections under this subsection. Mr. Sirois welcomed the

---

[2] See, §2430-G. Record keeping; inspections; reporting requirements, 2.  Inspections.

OMP inspector and provided full access to his entire cannabis facility and caregiver operation.

On June 28, 2019, Luke's caregiver facility was inspected for compliance by OMP and received a fully compliant inspection letter on July 8, 2019.[3] The inspection for compliance is highly detailed and covers all items including total plants, record and bookkeeping, employee management, document management, etc.[4] Specifically, OMP inspected employee registrations, cards, and personnel files. All required food licenses. Designation forms and required paperwork for minors, family, household members and out of state visiting patients. Packaging and labeling. Patient transactions or sales logs. Cultivation related pesticide licenses. Total plant counts for mature and immature plants. Security posture including locks, fencing, and other measures. And all trip tickets. It was at this inspection that the OMP inspector Matt Clark commented that Mr. Sirois was under the allowable limit for mature plants and that he could in fact grow more if he wished to. The inspection made no findings of non-compliance and did not require a plan of correction which it would have within five business days had there been any findings. Mr. Sirois offered additional areas for the inspector to observe that were not required but were offered in an extension of Mr. Sirois' own transparency desires.

### Post 2020 Execution of Search Warrants

OMP temporarily suspended Mr. Sirois' license as a reactive measure to the search warrants executed on his facilities in July 2020. The suspension which went into effect in August 2020 was removed less than two months later as OMP reinstated Mr. Sirois' license and the licenses of associated caregivers on September 15, 2020. In that letter, OMP noted that they would reinspect Mr. Sirois for compliance and on March 22, 2021, OMP issued a brand-new license to Mr. Sirois to continue as caregiver for another year.

The state of Maine, therefore, fully evaluated and authorized Mr. Sirois to operate as a cannabis business; inspected his cannabis businesses as part of a random on-site inspection and found no instances of non-compliance; reevaluated and reinstated his license after the raid by the US Government, and then upon further evaluation and inspection issued a new license in March of 2021 indicating its belief that Mr. Sirois was following the law and operating a compliant caregiver program.

### Conclusion

Mr. Sirois has a demonstrated and well-documented track record of strict compliance with all state laws and regulations in the operation of his licensed cannabis business. Beyond his own strict compliance, he has been an advocate for more comprehensive compliance program in the state and voluntarily requested additional state inspections of his operation. The absence of any non-compliance issues is fatal to any federal prosecution as a misuse of DOJ funding in violation of the Rohrabacher-Farr Amendment.

---

[3] See, 1. Office of Marijuana Policy On-site Inspection June 28, 2019, Enclosure 1.
[4] See, Primary Caregiver Compliance Checklist, Enclosure 2.

To the extent that you allege that there have been any regulatory compliance issues which would authorize you to use DOJ funds in the investigation and prosecution of Luke Sirois, I would like to reiterate my desire to have a conversation with you to address these issues. If you are right, then you haven't lost anything as the prosecution can proceed as planned. However, in the alternative, if you are mistaken then it is far better to address the issue early. I'm sure you can appreciate that if we are right and a judge finds after a hearing that you have been expending DOJ funds in violation of the Rohrabacher-Farr Amendment, the existence of this letter, and a failure to have a discussion about its contents, will only compound the violation.

We are happy to continue our discussion with you on the issue of compliance under state law and look forward to that opportunity.

Very truly yours,

Timothy C. Parlatore, Esq.

Encl:  1)  Office of Marijuana Policy On-site Inspection June 28, 2019
       2)  Primary Caregiver Compliance Checklist
       3)  Letter from Office of Marijuana Policy reinstating license Sept 15, 2020
       4)  New license issued March 22, 2021

6



**STATE OF MAINE**
**OFFICE OF MARIJUANA POLICY**
**162 STATE HOUSE STATION**
**111 SEWALL ST**
**AUGUSTA, MAINE 04333-0162**

ADMINISTRATIVE & FINANCIAL SERVICES

KIRSTEN LC FIGUEROA
COMMISSIONER

OFFICE OF MARIJUANA POLICY

ERIK GUNDERSEN
DIRECTOR

JANET T. MILLS
GOVERNOR

### Maine Medical Marijuana Program (MMMP)

☒ On-Site Assessment          ☒ Case Number: _2019-MMP-41_          ☐ Other

MMMP Participant:     ☒ Caregiver     ☐ Dispensary     ☐ Patient     ☐ Provider

Name: _LUCAS SIROIS / ALISA SIROIS_          ☐ Donation (s)

Location (s): _374 HIGH ST FARMINGTON, ME_

---

Investigator:     ☐ Wade Maddox     ☐ James York     ☐ Mark Desjardin     ☒ Matt Clark

☒ No finding of Non-Compliance on this date: _7/8/19_          No action required at this time.

☐ Notice of Non-Compliance on this date: _____          Further action required.

Violation Type:
☐ Collective
☐ Current registry identification card (s)
☐ Employee registered/card/personnel file
☐ Failure to notify changes
☐ Food establishment license if applicable
☐ Designation form/required paperwork—Minors/Family/Houshold members/Out of State visiting patients
☐ Packaging and labeling
☐ Patient transaction log
☐ Pesticide license if applicable
☐ Plant count
☐ Refusal of entry
☐ Security/fence/locks
☐ Trip tickets
☐ Other _____

---

☐ *A Plan of Correction must be submitted to MMMP within 5 business days of receipt of this notice.*

**By signing this form, I acknowledge I have received:
1. A copy of this report.
2. A notice of the reason for an on-site assessment, prior to entry.

☐ Refusal to sign

**Participant Signature

_7/8/19_
Date

Investigator Signature

_7/8/19_
Date

Phone: (207) 624-7491   Fax: (207) 287-2671
www.maine.gov

Enclosure 1Enc

## PRIMARY CAREGIVERS COMPLIANCE CHECKLIST

A.   Documentation Required For Primary Caregivers (PC) to Assist and Cultivate on Behalf of Qualifying Patients (QP)

    1.      Submit a completed Department-approved Primary Caregiver Application unless only assisting a patient who is a member of the caregiver's family or household (the registration card is non-transferrable)    \_\_\_\_\_

    2.      Obtain a registry identification card for each patient up to a maximum of five patients per PC    \_\_\_\_\_

    3.      Obtain and maintain completed designation form (see Section B below) designating the PC and indicating whether cultivating on behalf of the patient and number of plants authorized to cultivate up to a maximum of six mature plants per QP    \_\_\_\_\_

### No work by PC until received registry identification card

    4.      30 calendar days prior to expiration of registry identification card submit a renewal application to the Department with $240 renewal fee per registry identification card; alternatively, PC may choose to submit an annual fee equal to $1,200, based on $240 per patient which allows PC to change the fifth QP throughout the year without submitting the per-patient fee at the time of the change.    \_\_\_\_\_

    5.      Notify the Department within ten days of a change in status or card information including any change in the PC's name or address    \_\_\_\_\_

    6.      Maintain a valid Maine issued driver's license with a photo or other Maine-issued photo identification in order to establish proof of authorized conduct    \_\_\_\_\_

    7.      Notify the Department within ten days of a change in patient designation, unless the caregiver has registered with a $1,200 annual fee and a new 5th QP designates the PC within ten days of the rescinded patient designation    \_\_\_\_\_

    8.      Outdated registry identification card must be surrendered by returning to Department, by mail or delivery within ten business days of the person's receipt of the new registry id card or it could be voided by Department    \_\_\_\_\_

B.   Documentation Required For PC To Assist Or Cultivate On Behalf Of QP

    1.      Obtain either a registry identification card from QP or a valid written certification form from QP's medical provider
- Confirm the registry identification card or written certification is current (forms of registry identification and written certification are attached as Exhibits A and B)
- Verbal confirmation from QP that their name and address are

Enclosure 2

consistent with documentation provided in connection with obtaining written certification or registry identification card

- Verbal confirmation that QP is abiding by the limits applicable to QP and has not designated a dispensary to cultivate in excess of limits allowed    _____

2.   Proof of identity – valid driver's license or other photographic identification in accordance with 22 M.R.S. §§ 2423-E(5) and 2425 (11)    _____

3.   Obtain completed department-approved Caregiver/Dispensary Designation Form (attached as Exhibit C)
- signed and dated by the QP
- designates PC to cultivate
- identifies the total number of plants (up to a maximum of six mature plants per QP) the PC has been designated to cultivate on behalf of QP
- signed and dated by the PC indicating acceptance, refusal or discontinuation of the designated relationship
- includes one-year expiration    _____

4.   If QP visiting from out of state, need valid certification from home state and Maine written certification    _____

5.   QP may rescind designation of a PC at any time by signing and dating the rescission section of the form and providing a copy to the PC
- Upon receipt of notice of rescission PC must return the designation card to the QP
- Unless new QP is designated within ten days, dispose of excess marijuana within ten days of discontinuation of QP designation
- Unless new QP is designated within ten days, notify the department of the change in designation    _____

6.   PC may terminate designated relationship at any time
- Must sign and date the QP's designation form indicating discontinuation of the relationship
- Return the designation card for the QP the same day the PC signs and dates the form
- Unless new QP is designated within ten days, dispose of excess marijuana
- Unless new 5th QP is designated within ten days, notify department of the change in designation    _____

C.   <u>PC Employee</u>

1.   A PC may employ one but not more than one employee    _____
2.   A registered PC's employee is required to complete a Department-Approved employee application form    _____
3.   A PC's employee may not commence work until they have received registry identification card    _____
4.   Employee's personnel file shall contain:
- documentation of background checks

- job description or employment contract
- Employment Eligibility verification form I-9
- Copy of current registry identification card
- copy of Maine driver's license or other State-issued photographic identification card

5. A registered PC employee is required to pay applicable taxes _____

6. PC must notify DHHS within ten days of the date that the PC's employee ceases to work for the PC _____

D. <u>Reporting and Recordkeeping Obligations</u>

1. Report annually the total number of patients who have designated the PC. Must include:
    - Date of QP designation and, if applicable, rescission date
    - Patient's unique identification number that appears on the patient's written certification _____

2. PC must retain the QP designation card for the period of time the designation is in effect _____

3. It is recommended that the PC retain copies of the QP proof of identity and registration card or certification authorizing the QP's use of medical marijuana for the period of time the designation is in effect
    - These records reflect confidential information and should be maintained separately so as to protect confidentiality
    - Information on QP may not be disclosed without the written consent of the QP _____

E. <u>Authorized Conduct</u>

1. For each QP a PC may possess up to:

    - 2 ½ ounces of prepared marijuana
        - Defined as the dried leaves and flowers and the by-products of the dried leaves and flowers of the marijuana plant that require no further processing and any mixture or preparation of those dried leaves and flowers or by-products, including but not limited to tinctures, ointments and other preparations, but does not include the seeds, stalks, leaves that are disposed of and not dried for use and roots of the plant and does not include the ingredients, other than marijuana, in tinctures, ointments or other preparations.
    - An incidental amount of marijuana
        - defined as up to 12 female nonflowering marijuana plants; an unlimited amount of marijuana seedlings, stalks and roots; and up to eight pounds of harvested, dried unprepared marijuana in varying stages of processing that are not included when calculating the allowable useable amount of marijuana

- Seedling means a marijuana plant that has no flowers and is less than 12 inches in height and diameter _____

2. For each QP a PC may cultivate:
   a. Up to six mature plants
      i. Defined as a harvestable female marijuana plant that is flowering _____

3. PC may dispense medical marijuana to QPs consistent with limits and provisions of the statute and rule _____

4. If PC discontinues designation relationship with QP excess marijuana must be lawfully disposed within ten-day period
   - PC may, at no cost and not for resale, give excess prepared marijuana to a registered dispensary, a QP, or another PC, if nothing of value is offered or transferred in return
   - A registered PC may transfer excess prepared marijuana to a registered dispensary for reasonable compensation up to two pounds in a calendar year
   - A copy of discontinued designation form should be kept for authorization of conduct _____

5. When a patient designation is discontinued or rescinded, a new 5th QP may replace that patient so long as it happens within ten days of the rescission or discontinuance. _____

F. <u>Indoor Cultivation (note that additional requirements govern outdoor cultivation)</u>

1. Cultivation must occur in an enclosed, locked facility or area on property that is owned or under the control of the qualifying patient or caregiver and all cultivation areas must be locked
   - Defined as a closet, room, building, greenhouse or other enclosed area that is equipped with locks or other security devices that permit access only by the individual authorized to cultivate the marijuana _____

2. Security measures for cultivation of marijuana for medical use need to be met to discourage theft, and ensure safety _____

3. PCs may rent separate, self-contained, locked and secured locations within a building where other PCs are present. However:
   - PC may not assist another caregiver in acts of cultivation or processing, which includes growing, harvesting, drying, manufacturing, storage, and dispensing; or in those duties designated to the caregiver and related to the administration of marijuana for medical use
   - Cultivation must occur in separate, self-contained locked and secured areas that are enclosed on all sides and function independently
   - All marijuana cultivated for medical use must be locked and stored separately
   - Materials used by a PC related to cultivation may be stored in

common areas

4.  No more than 2 PCs who are members of the same family (spouse, domestic partner, child, sibling, aunt, uncle, niece, nephew, parent, stepparent, grandparent or grandchild of another person) or household (2 or more share a dwelling) may share the same enclosed, locked facility to cultivate marijuana _____

5.  An employee may not cultivate the employee's marijuana in the same enclosed, locked facility used by the primary caregiver who employs the employee _____

6.  Indoor cultivation must meet requirements of electrical installation and inspections of 32 MRS Sections 1104 _____

7.  Access to cultivation area is restricted, except for the following:
    - an elected official invited by the PC for the purpose of providing education to the elected official on cultivation
    - emergency services personnel
    - an employee of a marijuana testing facility or a person who needs to gain access to the cultivation facility in order to perform repairs or maintenance or to do construction may access the cultivation facility to provide professional services while under the direct supervision of the PC
    - Proof of identity via a valid Maine driver's license is required. _____

G.  <u>Labeling Requirements</u>

1.  Each plant (mature and immature) must be tagged with each QP's numeric identifier included in their valid written Certification _____

2.  Packaged marijuana and products containing marijuana for medical use must report total amount of prepared marijuana as evidence of compliance, not to exceed statutory limits (2 ½ ounces)
    - If any information on label about contaminants, the cannabinoid profile or the potency of the marijuana plant of product containing marijuana, the label must by verified by a marijuana testing facility that is not owned by the PC _____

3.  In order to label as organic, plants must be prepared, produced, and processed in accordance with applicable standards _____

4.  Confirm not preparing or transferring marijuana food containing products (if so, subject to additional requirements) _____

H.  <u>Enforcement</u>

1.  Surrender to the Department any primary caregiver registry identification card that is no longer valid, including employee registry identification cards _____

2.  Must cooperate with on-site inspections _____

- Confirm proof of identity before allowing access to cultivation facility
- Take appropriate precautions to protect QP confidential Information                                                                 _____

I.    <u>Miscellaneous PC Obligations</u>

1.    Pay applicable taxes and maintain appropriate records for tax purposes                                                                          _____
2.    Trip ticket is required if transporting marijuana from the cultivation location to dispense from a different location          _____
3.    PC and employee must maintain confidentiality of QPs     _____



JANET T. MILLS
GOVERNOR

STATE OF MAINE
OFFICE OF MARIJUANA POLICY
162 STATE HOUSE STATION
19 UNION STREET
FIRST FLOOR
AUGUSTA, MAINE  04333-0162

ADMINISTRATIVE & FINANCIAL SERVICES

KIRSTEN LC FIGUEROA
COMMISSIONER

OFFICE OF MARIJUANA POLICY

ERIK GUNDERSEN
DIRECTOR

September 15, 2020

**USPS First Class Mail**

Lucas Sirois
PO Box 166
Farmington, ME 04938-0166

**Subject: Notice of reinstatement of Registry Identification Card(s)**

Dear Mr. Sirois:

The Maine Department of Administrative & Financial Services, Office of Marijuana Policy (Department) hereby rescinds its letter of August 14, 2020. Your registry card and the registry cards of those assistants suspended due to your ineligibility are reinstated. Thus, the Department will not be scheduling an informal hearing at this time.

The Department has serious concerns regarding your compliance with MRS Title 22 Chapter 558-C and 18-691 C.M.R Chapter 2. The Department will be conducting a thorough inspection of your caregiver activities pursuant to its authority under 22 MRS Chapter 558-C. The Department reserves the right to take future administrative action pending its findings in the forthcoming inspection.

Sincerely,

Vernon Malloch
Director of Compliance
Office of Marijuana Policy

Cc: Scott D. Anderson, Attorney, Verill Dana LLP

Enclosure 3



# Exhibit B

# Congress of the United States
## Washington, DC 20515

July 30, 2015

The Honorable Michael E. Horowitz
Inspector General
Department of Justice
950 Pennsylvania Avenue, NW
Suite 4706
Washington, DC  20530-0001

Dear Mr. Horowitz:

As you may be aware, the Consolidated and Further Continuing Appropriations Act of 2015 (PL 113-235) contains a section familiarly known as "Rohrabacher-Farr." This provision, Sec. 538, is a prohibition on the Department of Justice from expending any funds to enforce federal laws against the "use, distribution, possession or cultivation of medical marijuana" in those states that have duly enacted laws for this purpose. Nonetheless, since the enactment of Rohrabacher-Farr the Department has continued to pursue and prosecute individuals and businesses for involvement with medical marijuana in states where it is legal despite the clear direction in the law to forswear such activities.

We request that you immediately investigate the Department's expenditure of funds to continue prosecuting these cases, which we believe are in direct violation of the prohibition on such expenditures established by Rohrabacher-Farr. We believe these expenditures violate both the Anti-Deficiency Act and the Rohrabacher-Farr provision of the Consolidated and Further Continuing Appropriations Act of 2015 (PL 113-235) Sec. 538. Accordingly, it is essential that the Inspector General ensure that the Department is maintaining records that document the management decisions made, as well as any fiscal implications of those decisions as they relate to these potential violations, so that the appropriate parties may be held accountable.

The Department of Justice admits that it is currently expending federal funds to prosecute the above-described medical marijuana cases. In an April 2, 2015 report in the *LA Times,* Patrick Rodenbush, a spokesman for the Department, claimed that Sec. 538 did not apply to cases against individuals or organizations, saying instead that it only stopped the department from "impeding the ability of *states* [emphasis added] to carry out their medical marijuana laws…" http://www.latimes.com/nation/nationnow/la-na-nn-medical-marijuana-abusers-20150401-story.html.

Mr. Rodenbush's interpretation clearly is a stretch. The implementation of state law is carried out by individuals and businesses as the state authorizes them to do. For DOJ to argue otherwise is a tortuous twisting of the text of Sec. 538 and common sense and the use of federal funds to

prevent these individuals and businesses from acting in accordance with state law is clearly in violation of Rohrabacher-Farr.

Beyond the obvious stretch in Mr. Rodenbush's statement, the Congressional intent of Sec. 538 is clear as delineated in the debate on the provision in Congress. We, the authors of the language, and our many colleagues—including those who opposed the amendment—laid on the record repeatedly that the intent and the language of the provision was to stop DOJ from interacting with anyone legitimately doing business in medical marijuana in accordance with state law. [See *Congressional Record,* May 29, 2014, pp. H4982-H4985, http://www.gpo.gov/fdsys/pkg/CREC-2014-05-29/html/CREC-2014-05-29-pt1-PgH4968-2.htm] Any official of the Department who interprets Sec. 538 differently, is doing so knowingly and willfully, without regard for the facts.

Cases such as the Kettle Falls Five case in Washington, asset forfeiture actions against dispensaries in the San Francisco Bay area, or the *Lynch* case now pending in the Court of Appeals for the Ninth Circuit, are all instances of DOJ expending dollars it does not have the legal authority to spend. Consequently, we believe there is sufficient cause for your office to investigate potential violations of the Anti-Deficiency Act by the Department with regard to its prosecution and other enforcement actions against persons and businesses conducting legitimate medical marijuana activities under state law.

We respectfully insist that you investigate the Department's apparent violation of the Anti-Deficiency Act and make recommendations to bring the Department into full compliance with the law, both under the Anti-Deficiency Act and the Rohrabacher-Farr provision of the Consolidated and Further Continuing Appropriations Act of 2015 (PL 113-235).

Sincerely,

REP. SAM FARR
Member of Congress

REP. DANA ROHRABACHER
Member of Congress

cc:    Robin C. Ashton
       Office of Professional Responsibility

       Legal Counsel's Office
       Executive Office for U.S. Attorneys