Jason H. Ehrenberg, Esq.
(*admitted pro hac vice*)
Holon Law Partners LLP
1178 Broadway, 3rd Floor #4503
New York, NY 10001
Direct: 202.888.3773
JEhrenberg@HolonLaw.com

*Attorneys for Defendant Lucas Sirois*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| vs. | Case No.: 21-cr-175-LEW |
| LUCAS SIROIS, | |
| Defendant | |

**DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL**
**PURSUANT TO FED. R. CRIM. PRO. 29(C)**

Defendants Lucas Sirois, Lakemont, LLC, Sandy River Properties, LLC, and Spruce Valley, LLC (collectively, "Defendant") respectfully renew their motion for judgment of acquittal under Fed. R. Crim. P. 29(c) as to Counts 1, 2, and 6–8 (the CSA / "marijuana" counts). This post-verdict motion is grounded in: (1) the plain text of the Controlled Substances Act ("CSA") and the 2018 Farm Bill; (2) the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, which overruled *Chevron* and restored courts' independent duty to interpret statutes; and (3) longstanding criminal-law doctrines of strict construction, fair notice, and the rule of lenity.

When those doctrines are applied to the trial record, no rational juror could find beyond a reasonable doubt that the government proved: (a) that the plant material at issue was "marihuana" rather than "hemp" as Congress defined those terms; (b) that at least 1,000 kilograms or 1,000 plants of such material satisfied the statutory definition for Counts 1 and 2; or (c) that the properties charged in Counts 6–8 were "drug-involved premises" for a felony CSA offense rather than sites where federally lawful hemp was grown or processed. Because the trial record, taken as a whole, showed at most a composite "total-THC" value generated by gas chromatography ("GC")—not the statutory $\Delta^9$-THC concentration—judgment of acquittal is required.

## I.    LEGAL STANDARD

Rule 29(c)(2) authorizes the Court, "on the defendant's motion," to "set aside the verdict and enter an acquittal" if "the evidence is insufficient to sustain a conviction." The question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The First Circuit repeatedly describes this standard as "formidable," but emphasizes that "despite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010). Courts "must reject those evidentiary interpretations and illations that are unreasonable, insupportable, or

2

overly speculative" and must reverse where "an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict." *United States v. Rodríguez-Martínez*, 778 F.3d 367, 371–73 (1st Cir. 2015).[1]

Crucially, the "elements" that must be proven are those that Congress placed into the statute—not elements as reimagined by an agency, a laboratory protocol, or a closing argument. Where the government's proof establishes something other than the statutory element—*e.g.*, "total THC" instead of the $\Delta^9$-THC threshold Congress enacted—Rule 29(c) requires acquittal.

## II.   STATUTORY FRAMEWORK: CONGRESS CHOSE A $\Delta^9$-THC ELEMENT, NOT "TOTAL THC"

### A.   "Marijuana" vs. "Hemp"

After the 2018 Farm Bill, the CSA defines "marihuana" to exclude hemp. 21 U.S.C. § 802(16)(B). The Farm Bill in turn defines "hemp" as:

> "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1) (emphasis added).

Thus, as a matter of law:

- **If cannabis material has ≤ 0.3% $\Delta^9$-THC (dry weight), it is "hemp," and**

- **Hemp is categorically excluded from "marihuana" under the CSA.**

---

[1] Other circuits apply the same principle. For example, in *United States v. Garcia*, 74 F.4th 1073 (10th Cir. 2023), the Tenth Circuit vacated VICAR murder convictions and ordered entry of judgments of acquittal where, notwithstanding a brutal homicide and extensive gang evidence, no rational factfinder could find the required VICAR "purpose" beyond a reasonable doubt. *Garcia* underscores that seriousness of the alleged conduct cannot substitute for proof of every element.

Congress did not criminalize THCA, "total THC" ($\Delta^9$ + THCA), "potential THC" after full decarboxylation, or any other non-statutory composite. The criminal element is whether the material exceeded 0.3% $\Delta^9$-THC on a dry-weight basis (making it "marihuana") or did not (making it "hemp"). The government had to prove that element beyond a reasonable doubt for: (1) the existence of the "marihuana" conspiracy in Count 1; (2) the 1,000-kg / 1,000-plant findings in Counts 1 and 2; and (3) the "drug-involved premises" findings in Counts 6–8.

The statutory text is clear. Under ordinary textualist principles, the inquiry "begins—and, where the language is clear, ends—with the words of the statute." The First Circuit "look[s] first to the statute's plain language" and "must give effect, if possible, to every clause and word of a statute," considering the text in context. *United States v. Godin*, 534 F.3d 51, 54–55 (1st Cir. 2008). There is nothing ambiguous about "delta-9 tetrahydrocannabinol concentration … on a dry weight basis."

Post–Farm-Bill appellate decisions read the $\Delta^9$ line the same way. In *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682 (9th Cir. 2022), the court held that hemp-derived delta-8 products are lawful "hemp" so long as $\Delta^9$-THC remains $\leq$ 0.3% by dry weight, rejecting contrary arguments grounded in agency guidance and generalized purpose. And in *Anderson v. Diamondback Inv. Group, LLC*, 117 F.4th 165 (4th Cir. 2024), the Fourth Circuit (post-*Loper Bright*) refused to defer to DEA's restrictive reading of hemp-derived cannabinoids and emphasized that the "best reading" of the Farm Bill treats products as lawful if they are derived from hemp and remain within the 0.3% $\Delta^9$-THC limit.

These decisions underscore the core point: it is $\Delta^9$-THC—not "total THC," not THCA, and not speculative "potential THC"—that marks the line between hemp and marijuana, and the government's proof must match the element Congress chose.

### III. AFTER *LOPER BRIGHT*, NO DEFERENCE IS OWED TO USDA/DEA "TOTAL-THC" REGIMES IN A CRIMINAL CASE

In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244 (2024), the Supreme Court squarely overruled *Chevron* and held that the Administrative Procedure Act ("APA") requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 5 U.S.C. § 706 directs courts to "decide all relevant questions of law" and "interpret constitutional and statutory provisions." The Court stressed in *Loper Bright* that judges may not "defer to an agency interpretation of the law simply because a statute is ambiguous" and concluded: "*Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."

In the criminal context, courts have found that deference to agency interpretations of criminal statutes has always been especially inappropriate. The Court has "never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 369 (2014). In *Crandon v. United States*, 494 U.S. 152 (1990), the Court refused to defer to the Office of Legal Counsel's interpretation of a criminal gratuities statute, emphasizing that agency interpretations "do not control" in defining crimes. Justice Scalia later summarized the point succinctly: "A court owes no

deference to the prosecution's interpretation of a criminal law." *Whitman v. United States*, 574 U.S. 1003 (2014) (statement respecting denial of certiorari).

*Loper Bright* reinforces that these are not mere slogans. Courts must adopt the best reading of the statute using ordinary tools of interpretation, and may treat agency views as persuasive under *Skidmore* at most—never controlling. That is doubly true where, as here, USDA and DEA seek to expand criminal liability by importing an administrative testing convention—"post-decarboxylation" or "total THC"—into the definition of "marihuana."

The question whether the CSA, as amended by the Farm Bill, defines "marihuana" in terms of $\Delta^9$-THC or "total THC" is a pure question of law. USDA's and DEA's guidance may be background, but after *Loper Bright* it is entitled to no binding deference—especially in a criminal prosecution.

## IV.  THE TRIAL RECORD PROVED ONLY A COMPOSITE "TOTAL THC," NOT THE REQUIRED $\Delta^9$-THC ELEMENT

### A.  GC "Total-THC" Testing: The Instrument Creates the Molecule It Purports to Measure

The government's own witnesses established a fatal mismatch between the CSA element and its proof. The DEA laboratory used gas chromatography, heating samples in the GC inlet to temperatures sufficient to decarboxylate THCA into $\Delta^9$-THC. **The lab then reported a single "THC" peak that merged native $\Delta^9$-THC and instrument-created $\Delta^9$-THC.** No native (pre-heat) $\Delta^9$-THC concentration on a dry-weight basis was ever quantified or reported.

Analysts acknowledged both the thermal conversion and the absence of controls necessary to apportion the reported peak between native $\Delta^9$ and instrument-created $\Delta^9$ (*i.e.*, instrument created conversion of the cannabinoids THCA and CBD onto $\Delta^9$). There were no conversion controls, no matrix-matched calibration to identify the portion of the peak attributable solely to native $\Delta^9$-THC, and no testimony explaining how one could reverse-engineer a pre-heat $\Delta^9$-THC percentage from a post-heat "total-THC" number.

The government's own witnesses confirmed the likelihood of thermal conversion taking place during the government's gas-chromatography testing of plant materials in this case, as well as the lack of any controls for such conversion. One DEA analyst after another testified to this effect – these analysts also testified that the elegant peer-reviewed scientific literature warns of and discusses the conversion of the non-psychoactive cannabinoids CBD and THCA into $\Delta^9$-THC when samples are "baked" during gas-chromatography testing. *See*, *e.g.*, trial testimony of analyst DiLalla:

> Q. "It's known that THCA can convert into THC and that CBD can convert into THC at high heat."
> A. "With the CBD I — I'm not —"
> Q. "You've accepted that you are aware."
> A. "Yes."
> Q. "You're aware that the science has said this."
> A. "That there are studies, yes."
> Q. "There is a known risk that CBD does convert into THC under certain conditions; are you aware of that?"
> A. "I am, yes."

*See* Docket No 705 (11/13/25 Tr. at 286:98–101, 310:57-67, DiLalla). Analyst DiLalla went as far as to explicitly state that the government's GC test, which heats up plant

samples to approximately 500 degrees Fahrenheit, could cause these other cannabinoids to convert into Delta-9 THC during testing:

> A: "It is converting the THCA to THC, yes, so it would increase the amount of the total THC, yes."
> Q. "So when we have a plant that is less than the percent… and the THCA converts and pushes it over the line, it's the lab test that's doing it, correct?"
> A. "Well, it's decarboxylating in the GC instrument, yes."

*See* Docket No. 706 (11/13/25 Tr. 309:1–7, DiLalla). *See also* Docket No**.** 706 (11/13/25 Tr. 310:102–105, DiLalla) ( Q. "The methodology heated it up over 490 degrees Fahrenheit?" A. "Yes.").

Analyst DiLalla also testified that THCA is different than Delta-9 THC and that the government's GC test causes THCA to convert into Delta-9 THC during testing and that the government's GC test measures only post-conversion total THC and does not differentiate THCA from Delta-9 THC:

> Q. "If the plant is less than 0.3 percent, it is not marijuana, correct?"
> A. "Of the levels of THC."
> Q. "Of delta-9 THC."
> A. "Delta-9 THC, the level we are doing our testing."
> Q. "And that does not include THCA; does it?"
> …
> A. "THCA is different than THC, yes."

*See* Docket No. 706 (11/13/25 Tr. 277:31–35, 277:44–45, DiLalla). Analyst DiLalla also confirmed that the GC test measures total THC, without differentiation between different cannabinoids, including CBD and THCA:

> Q. "…it doesn't matter how much THCA is in that plant if it measures out at less than 0.3 percent, correct?"
> A. "This isn't my realm. I do my analysis and I'm measuring the level of THC."

*See* Docket No. 706 (11/13/25 Tr. 278:79–80, DiLalla). And she testified that "The THCA decarboxylates in the instrumentation process and converts to THC, which we are measuring at this peak here. It is showing the THC and the converted THC all in one peak together." *See* Docket No. 706 (11/13/25 Tr. 254:46–49, DiLalla) (emphasis added). Analyst DiLalla testified that this was the purpose of the GC test:

> Q. "And was the method designed to do this?"
> A. "Yes, it is… validated to take all of the THC into account."

*See* Docket No. 706 (11/13/25 Tr. 254:50–52, DiLalla).

Other testimony from government lab analysts confirmed that CBD and THCA can convert/transform to delta-9 THC when their molecular structure changes during the government's heating/testing process and that the government's GC test only measures for total THC and does not account for this conversion. *See*, *e.g.*, See Docket No. 706 (11/13/25 Tr. 348:98–100, Chiesa) ("The THCA can convert to delta-9 with heat, yes."); Docket No. 706 (11/13/25 Tr. 436:87–91, Skuches) (Q. "Decarboxylation could cause the transformation of some CBD or some THCA into delta-9 THC, correct?" A. "It's outside my scope. I don't know."); Docket No. 706 (11/13/25 Tr. 254:31–36, DiLalla) (Q. "Does this include all the THC… acids, salts, isomers?" A. "It does, yes."); Docket No 706 (11/13/25 Tr. 255:81–83, DiLalla) ("We are measuring the total amount of delta-9 THC to include THCA."); Docket No. 706 (11/13/25 Tr. 254-36-49) ("It's decarboxylating in the GC instrument, yes."); Docket No. 706 (11/13/25 Tr. 254:36–49, DiLalla); ("It is showing the THC and the converted THC all in one peak together.")

USDA's hemp regulations and guidance require "post-decarboxylation or other similarly reliable methods" that "consider the potential conversion of

delta-9 tetrahydrocannabinolic acid (THCA) into delta-9 tetrahydrocannabinol (THC)" and report a "total THC" value on a dry-weight basis. As confirmed by the government's own DEA lab analysts, GC, one such method, heats the sample and therefore measures "total potential THC," not the pre-existing $\Delta^9$-THC in the plant at room temperature. **High-performance liquid chromatography (HPLC), by contrast, can separately quantify $\Delta^9$-THC and THCA without decarboxylation, but the government relied on GC-style "total THC" reporting rather than distinct $\Delta^9$ measurements.**

The upshot is straightforward: at most, the government's lab reports and testimony showed that if the seized cannabis were heated and fully decarboxylated, the sum of $\Delta^9$-THC and THCA/CBD would exceed 0.3% "total THC" by dry weight and that certain lots would be deemed "non-compliant hemp" for regulatory purposes. The government did not establish that, at the time of seizure, the plant material tested contained more than 0.3% actual $\Delta^9$-THC on a dry-weight basis, as Congress required for "marihuana." This is untenable. A conviction cannot rest on a test that manufactures the molecule constituting the element it purports to prove. *See Bullcoming v. New Mexico*, 564 U.S. 647, 651–52 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310–11 (2009).

### B.    Government Agents Cannot Visually Distinguish Hemp from Marijuana

On cross-examination, Special Agent Richards candidly admitted that he had received no training to distinguish legally defined hemp from marijuana:

- Asked if he could describe his training "to distinguish the hemp plant from the marijuana plant," he answered: "I can't."

- Asked whether agents were trained in 2018 to spot the difference between a hemp flower and a delta-9-THC flower, he responded: "They did not."

- Asked whether that training came in 2019 or 2020, he answered: "They never have."

Special Agent Richards also conceded at trial that he had never heard of THCA, despite its centrality to the hemp-versus-marijuana distinction in this case. This testimony confirms that visual, olfactory, and experiential cues cannot distinguish federally illegal marijuana from federally legal hemp. The government relied entirely on laboratory testing to draw the statutory line—and that testing targeted a different metric than the one Congress enacted.

## C.    The Government's Closing Argument Rested on "Total THC" and Regulatory Gloss

In closing, the prosecutor leaned heavily on USDA/DEA "post-decarboxylation/total-THC" guidance and hemp-program sampling rules as if they defined the CSA element. He told the jury that the Farm Bill definition includes "acids—that's THCA" and speaks of "total delta-9 THC concentration"; quoted CFR language requiring "test results [to] reflect the total available THC derived from the sum of the THC and THCA content"; and asserted that "DEA's job is to make sure that what they have isn't hemp, that it's marijuana. The testing was developed in order to do that." *See* Docket No 710 (Tr. Trans. 11/18/25 at 99). The closing further argued that when the lab says a sample is marijuana, "it's not a close call," expressly tying that conclusion to a 1% qualitative cutoff rather than the statutory 0.3% Δ⁹ threshold. (*Id*. at 99-100).

This argument: (1) conflated the Farm Bill's statutory definition with USDA/DEA regulatory gloss; (2) shifted the jury's focus from $\Delta^9$-THC concentration at harvest to "total THC" after decarboxylation; and (3) invited conviction based on "potential" THC derived from THCA instead of the actual $\Delta^9$-THC percentage Congress specified. Under *Loper Bright* and longstanding non-deference principles in criminal law, the Court cannot endorse that gloss. The element remains what Congress wrote: $\Delta^9$-THC concentration, not an agency's "total THC" convention.

## IV-A. TRIAL TESTIMONY CONFIRMS THAT THE GOVERNMENT DID NOT PROVE THE STATUTORY ELEMENT

### A. Government agents admitted they cannot distinguish hemp from marijuana in the field

As noted, on cross-examination, Special Agent Richards admitted that he received no training to distinguish legally defined hemp from marijuana. Asked if he could describe his training "to distinguish the hemp plant from the marijuana plant," he answered: "I can't." *See* Docket No. 705 (Trial Tr. Nov. 12, 2025, at 203.) Asked, "In 2018, did they train you on how to spot the difference between a hemp flower and a delta-9 THC flower?" he responded: "They did not." (*Id.*) Asked whether that training ever came in 2019 or 2020, he answered: "They never have." / "No, never." (*Id.*) Agent Richards also conceded he had never heard of THCA, despite it being a central issue in distinguishing hemp from marijuana in this case. (*Id.*) This testimony confirms that visual, olfactory, and experiential cues used by law enforcement cannot distinguish federally illegal marijuana from federally legal hemp, and that the government relied entirely on laboratory testing to make that distinction.

**B. Defense established that DEA's 2019 SOP and GC–MS method do not measure Δ9-THC concentration on a dry-weight basis**

The government's own laboratory methodology does not prove the element Congress enacted. At trial, the Defense presented the unrebutted expert testimony of Mark A. Scialdone, Ph.D., an organic chemist and plant scientist. Significantly, Dr. Scialdone was the only witness qualified as an expert at trial (none of the government's DEA lab analysts were presented as, or qualified as, expert witnesses at trial). Dr. Scialdone, an experienced chemist, professor, and inventor with numerous patents, testified:

- He is familiar with the DEA's 2019 SOP, but has never used it, because it "has not been validated in the peer-reviewed literature as being an analytical technique that actually measures the amount of cannabinoid that's present." (Trial Tr. Nov. 17, 2025, at 832–33.)

- The DEA's GC–MS method does not determine the Δ9-THC concentration on a dry-weight basis as required by law:

- In his report, he stated that DEA's method "does not determine the delta-9 THC concentration on a dry weight basis as required by law," and he confirmed at trial, "That is correct." (Trial Tr. Nov. 17, 2025, at 835.)

- When asked, "Does the DEA method determine the delta-9 THC concentration on a dry weight basis?" he answered: "No, it does not." (Id.)
- The method only identifies the presence of THC and does not quantify it:

- He explained that the DEA SOP "identifies the presence of THC, but it does not quantitate it." (Id. at 835.)

- He testified that no one uses DEA's 2019 SOP in the peer-reviewed scientific community:

- When asked if he was aware of any peer-reviewed literature supporting the DEA's SOP/GC–MS method, he stated that aside from a single 2004 citation, "No, no one uses that method." (Trial Tr. Nov. 17, 2025, at 833.)

By his unrefuted testimony, the government's chosen method: (1) does not measure the very metric Congress made dispositive (Δ9-THC concentration on a dry-weight basis), and (2) is not accepted as a reliable quantitative method in the relevant scientific community.

## C. Defense established that the DEA's GC–MS method chemically transforms the sample (THCA → Δ9-THC) during testing

Dr. Scialdone further testified that the DEA's technique changes the compound being measured. He explained that DEA's method involves placing cannabis samples in an "oven," heating them to approximately 250°C (about 480°F). (Trial Tr. Nov. 17, 2025, at 847.) He testified that when cannabinoid acids like THCA are heated, they undergo decarboxylation, and "that decarboxylation results in the formation of delta-9 THC from THCA." (Id. at 847.) In other words, the test itself converts non-psychoactive THCA into Δ9-THC, changing the chemical composition from what was actually present in the plant at harvest. Dr. Scialdone also agreed that multiple factors—heat, light, oxygen, solvents—can significantly increase Δ9-THC percentage during testing, but that no one knows exactly how much, which contributes to the method's failure to withstand peer-reviewed scrutiny. (Trial Tr. Nov. 17, 2025, at 846, 861.)

## D. Defense showed that the key legal distinction—hemp vs. marijuana—is based on THC percentage, but DEA's method does not quantify

Dr. Scialdone testified clearly: "It's important because the distinction between hemp and cannabis is made on a THC percentage basis." *See* Docket No 709 (Trial Tr. Nov. 17, 2025, at 846.) Yet, as he also testified, the DEA's method: (1) does not quantify Δ9-THC concentration; (2) uses a qualitative "1%" threshold that does not reflect the statutory 0.3% standard; and (2) is not a peer-reviewed, experimentally validated method. *See* Docket No 709. (Trial Tr. Nov. 17, 2025, at 861.) He confirmed that the method's "1

14

percent" call is only a qualitative assessment, not a quantitative measurement of Δ9-THC, and that the method therefore cannot reliably distinguish material that is just above or below the 0.3% statutory line. (*Id.*)

### E. Defense established that visually, legal THCA hemp flower is indistinguishable from what lay people call "marijuana"

Defense counsel sought to use a demonstrative exhibit of legal THCA hemp flower. In doing so, counsel proffered that: "THC hemp flower [is] legally sold nationwide and … it is indistinguishable in appearance and smell from what lay people call marijuana." *See* Docket No 709 (Trial Tr. Nov. 17, 2025, at 809–10.) The Court permitted the government's objection to the physical demonstrative, but the proffer itself accurately describes the defense theory the Court recognized as central: You cannot tell hemp from marijuana by sight, smell, or feel; only chemistry—and correct chemistry—can draw the line.

### F. The Court recognized that the defense theory is that "these plants might well have been hemp," and that it is the government's burden to prove otherwise

In a colloquy addressing 404(b) evidence and the government's motion to preclude THCA-conversion argument, the Court summarized the defense position: "Portions of the defendants' theory of the case is that this is technical in nature, meaning who knows what these plants were, that they might well have been hemp and not a Schedule I narcotic." *See* Docket No 709 (Trial Tr. Nov. 17, 2025, at 806.) Later, regarding jury instructions, the Court expressly acknowledged: The Court had "taken some length to define the distinction between hemp and marijuana," and that "it's the government's burden … because it has the burden to prove" the offense, implicitly including proof that the substance is not hemp. *See* Docket No 709  (Trial Tr. Nov. 17, 2025, at 879.) Thus the Court recognized on the

record that: the hemp vs. marijuana distinction is central; and the burden to exclude hemp rests with the government.

### G. Government closing relied on a non-statutory 1% THC threshold and misstated the Farm Bill as requiring "total THC" / THCA conversion

Despite the statutory 0.3% Δ9 standard and the scientific problems with DEA's method, the government in closing: told the jury that the DEA method was designed to separate marijuana from hemp and that it was "super conservative and defendant-friendly" because "Marijuana is defined under law as 'cannabis with a 0.3 percent THC concentration by volume,' right? The DEA's test is designed to determine whether that concentration is less than or greater than 1 percent. That's 3 times the legal limit." *See* Docket No 710  (Trial Tr. Nov. 18, 2025, at 926–27.) The government then argued that when the lab says a sample is marijuana, "it's not a close call." (*Id*. at 927.)

This argument flatly concedes that the method: uses a 1% qualitative cutoff, not the 0.3% Δ9 threshold Congress enacted, and uses that non-statutory cutoff to brand material as "marijuana" without ever proving it crossed the 0.3% statutory line.

The government also presented a Farm Bill / CFR slide in its closing argument that blended statutory text with regulatory language and then told the jury: The Farm Bill definition includes "acids—that's THCA" and speaks of "total delta-9 THC concentration." *See* Docket No 710 (Trial Tr. Nov. 18, 2025, at 999.) The government quoted CFR language: "The testing methodology must consider the potential conversion of THCA in hemp into THC, and the test results must reflect the total available THC derived from the sum of the THC and THCA content." (*Id*.) The government then asserted: "So the Farm Bill is saying that what is hemp includes that THCA. That THCA needs to

16

be measured for its potential delta-9 THC content. That's the Farm Bill." (*Id.*) And, the government argued that: "Total THC is the value determined after the process of decarboxylation … derived from the sum of the THC and THCA content and reported on a dry weight basis. The bill defines what hemp is. DEA's job is to make sure that what they have isn't hemp, that it's marijuana. The testing was developed in order to do that." (*Id.*)

This closing (1) conflated the Farm Bill's statutory definition with USDA/DEA regulatory gloss, (2) shifted the jury's focus from Δ9-THC concentration at harvest to "total THC" after decarboxylation, a wholly different metric, and (3) effectively invited the jury to convict on the basis of "potential" THC derived from THCA or CBD instead of the actual Δ9-THC percentage Congress specified. Under *Loper Bright*, the Court cannot endorse that gloss. The element remains what Congress wrote.

## V.    SUFFICIENCY    PRINCIPLES    FROM    PEREZ-MELENDEZ, RODRÍGUEZ-MARTÍNEZ, LIPSCOMB, AND GARCIA REQUIRE ACQUITTAL

In *Perez-Melendez*, truck drivers were convicted of aiding and abetting a cocaine conspiracy based on transporting pallets in which drugs were hidden. The First Circuit reversed, emphasizing that although the standard is "formidable" and defendants face an "uphill battle," sufficiency review "is not an empty ritual." 599 F.3d at 40. The court held that circumstantial evidence was not sufficient where it did not adequately support the inference that defendants actually knew of, or were willfully blind to, the cocaine hidden in their cargo. In *Rodríguez-Martínez*, the First Circuit reiterated that courts must reject speculative inferences and reverse where the record supports "an equal or nearly equal theory of guilt and a theory of innocence." 778 F.3d at 372–73.

Those principles apply directly here. The government's GC "total-THC" numbers permit at least two equally plausible inferences:

1. The material contained lawful hemp, with $\Delta^9$-THC $\leq 0.3\%$, but GC heat converted THCA and inflated the total-THC reading; or

2. The material contained unlawful "marihuana," with native $\Delta^9$-THC $> 0.3\%$.

Because the lab never measured $\Delta^9$-THC alone and offered no scientifically grounded way to disaggregate native $\Delta^9$ from instrument-created $\Delta^9$, the jury had no non-speculative basis to choose the second inference over the first. Under *Perez-Melendez* and *Rodríguez-Martínez*, the Court cannot allow convictions to rest on that foundation. Finally, *Garcia* confirms that courts must vacate convictions—even in cases involving grave violence—when the government fails to prove a specific element beyond a reasonable doubt. The Tenth Circuit held that although the evidence might support state-law homicide convictions, it did not support the VICAR-specific purpose element and ordered judgments of acquittal. 74 F.4th at 1105–12.

Here, whatever the government's views about cannabis policy, the CSA criminalizes conduct involving "marihuana," not all hemp-derived products. Without proof that $\Delta^9$-THC exceeded 0.3% on dry weight basis, serious or large-scale conduct cannot substitute for the missing element.

## VI.   STRICT CONSTRUCTION, LENITY, AND FAIR NOTICE

Criminal statutes are strictly construed; courts may not enlarge them by administrative implication. *See United States v. Granderson*, 511 U.S. 39, 54 (1994) (applying rule of lenity in favor of accused); *McBoyle v. United States*, 283 U.S.

25, 27 (1931); *United States v. Santos*, 553 U.S. 507, 514 (2008). Congress criminalized "marihuana" and $\Delta^9$-THC—not THCA, CBD/CBDA, or "total-THC." *See also United States v. Eaton*, 144 U.S. 677, 688 (1892); *United States v. Phifer*, 909 F.3d 372, 384–86 (11th Cir. 2018) (agencies may not expand controlled-substance definitions by regulation).

As the Supreme Court explained in *Lanier*, the rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." 520 U.S. 259, 266 (1997). *Crandon* similarly instructs that any lingering ambiguity about the scope of a criminal statute "should be resolved in the [defendant's] favor unless and until Congress plainly states that we have misconstrued its intent." 494 U.S. at 168.

The Court has repeatedly invoked lenity where competing readings of a criminal statute were textually plausible. *See*, *e.g.*, *United States v. R.L.C.*, 503 U.S. 291 (1992); *Santos*, 553 U.S. 507; *McBoyle*, 283 U.S. 25. The First Circuit, too, has invoked lenity to resolve ambiguity in defendants' favor, including in *Godin* when interpreting "another felony offense" in 18 U.S.C. § 1028A. 534 F.3d at 54–57.

Here, any tension between Congress's $\Delta^9$-only line and USDA/DEA's "total-THC" methodology must be resolved in favor of the $\Delta^9$-only reading. At minimum, there is substantial tension between (a) statutory text focusing exclusively on $\Delta^9$-THC concentration and (b) administrative conventions that reclassify crops as "non-compliant" based on potential $\Delta^9$ after heating and

19

decarboxylation. If the Court perceives any arguable ambiguity between those conceptions, lenity demands adoption of the Δ⁹-only rule Congress actually wrote.

Fair-notice and vagueness concerns amplify this conclusion. In *Johnson v. United States*, 576 U.S. 591 (2015), and *United States v. Davis*, 588 U.S. 445 (2019), the Court invalidated "residual clause" definitions that failed to provide clear standards. In *Burrage*, the Court rejected a "contributing cause" standard that would dramatically expand liability, noting that criminal statutes must be applied as written and ambiguity resolved against the harsher interpretation. Allowing conviction under a shifting "total-THC" regime—based on technical post-harvest testing protocols that combine acids and neutrals and that even scientists regard as problematic near the 0.3% line—would erode the clear Δ⁹-based boundary Congress enacted and raise serious fair-notice concerns.

*Loper Bright* itself recognizes lenity as a traditional canon that protects both constitutional structure and individual liberty, contrasting it with *Chevron's* now-rejected deference regime. Lenity ensures that "before a man can be punished as a criminal under the federal law his case must be plainly and unmistakably within the provisions of some statute." *Crandon*, 494 U.S. at 158. Where, as here, agencies have adopted a "total-THC" convention for administrative purposes and defendants have structured their conduct around Congress's explicit Δ⁹-only line, fair-notice and lenity principles confirm that criminal prosecution cannot extend beyond the statute's clear text.

## VII.    The GC Test is Unsupported by the Relevant Scientific Community

The President's Council of Advisors on Science and Technology (PCAST) 2016 Forensic Science Report provides authoritative scientific and legal support for challenging the DEA's use of gas chromatography (GC) to classify cannabis under the 0.3% delta-9 THC legal threshold. PCAST establishes a clear and uncompromising principle: forensic methods cannot be considered scientifically valid unless they have been empirically tested under conditions reflecting actual use, with known accuracy and error rates. According to PCAST, no amount of long-time use, tradition, accreditation, training, or examiner experience can substitute for empirical validation. **A forensic technique is either scientifically validated or it is not science.**

This directly undercuts the DEA's reliance on its decades-old GC method. The DEA has never conducted or published empirical validation studies demonstrating that GC can reliably distinguish legal hemp from illegal marijuana at the 0.3% threshold. The method has no documented error rate for this statutory purpose, **and modern research confirms that GC's heated inlet chemically converts THCA and CBD into delta-9 THC — artificially increasing the very analyte that determines criminal liability.** Under PCAST's framework, a method that *creates* the controlled substance it purports to measure cannot be considered scientifically valid.

PCAST also warns that when a forensic method lacks empirical validation or produces unmeasured false positives, it "**lacks a scientific foundation**." This language is directly applicable to the DEA's GC cannabis method, which has never been validated to control or quantify thermal conversion, has no known accuracy in the 0.25–0.35% range,

and lacks measurement uncertainty — all essential components for determining whether a sample satisfies or exceeds the legal 0.3% limit.

PCAST further reinforces the *Daubert* gatekeeping framework, emphasizing that courts must exclude forensic evidence that does not meet the standards of scientific validity. Because the DEA's GC method fails foundational validity, has no known error rate, and contradicts modern forensic standards (including OSAC/NIST 2022, which mandates conversion controls and recommends liquid chromatography), the method does not satisfy Rule 702 and *Daubert*. PCAST makes it clear that such unvalidated methods cannot be accepted as reliable science in a criminal prosecution.

Finally, PCAST highlights the constitutional stakes. When the government uses scientifically invalid methods in criminal cases, it places defendants at risk of wrongful conviction and undermines the integrity of the justice system. That is precisely the danger here: a method known to alter evidence and inflate THC values cannot support the deprivation of liberty. Under PCAST's reasoning, continuing to use an unvalidated method in criminal prosecutions raises serious due process concerns.

The PCAST Report provides an authoritative, presidential-level scientific basis to argue that the DEA's GC method is not scientifically valid, does not meet *Daubert*, lacks a known error rate, risks false positives through thermal conversion, violates modern forensic standards, and cannot constitutionally be used to determine criminal liability. It is exactly the kind of forensic practice PCAST warns courts to reject.

## VIII.  APPLICATION: NO RATIONAL JUROR COULD FIND THE CSA ELEMENTS PROVEN

### A.    Counts 1 and 2 – Failure to Prove "Marihuana" and the 1,000-kg / 1,000-Plant Thresholds

Even crediting every government witness and drawing all inferences in the government's favor, no rational juror could conclude that the seized biomass and plants constituting the 1,000-kg / 1,000-plant findings were "marihuana" rather than hemp.

The only testing method presented: (1) did not measure $\Delta^9$-THC concentration on a dry-weight basis; (2) used a 1% qualitative cutoff, not the 0.3% $\Delta^9$ threshold Congress enacted; (3) chemically converted CBD and THCA into $\Delta^9$-THC during testing; and (4) was not a peer-reviewed, validated method capable of accurately drawing the 0.3% line.

The government thus proved something different: that the material generated a "THC" signal under a non-statutory, conversion-based test with a 1% threshold. That is not the CSA element. Under *Jackson* and the First Circuit cases discussed above, conviction cannot rest on proof of the wrong metric.

Count 2 is especially vulnerable. The conviction and 1,000-kg / 1,000-plants finding depend on proof that the particular seized products underlying that count were "marihuana" rather than hemp. Because the government never measured $\Delta^9$-THC and never compared $\Delta^9$-only to 0.3% on a dry-weight basis, no rational juror could find that element beyond a reasonable doubt.

23

**B.    Counts 6–8 – "Drug-Involved Premises" Counts Are Parasitic on the Same Defect**

Counts 6–8 require proof that each property was used to commit or facilitate a felony drug offense—here, cultivation or distribution of "marihuana" in violation of the CSA.

But as shown, the government never proved that the cannabis grown or stored at those premises was "marihuana" rather than hemp; it never quantified $\Delta^9$-THC at harvest for the bulk biomass; and it relied on a method that cannot reliably distinguish products above vs. below the 0.3% $\Delta^9$ line.

Under the correct legal standard, the premises counts are parasitic on the same defective identity proof. If the government did not lawfully prove that the material was "marihuana," it necessarily did not prove that the premises were used for a felony CSA offense.

**C.    The Record, Taken as a Whole, Shows Only "Total THC," Not $\Delta^9$-THC > 0.3%**

Taking the entire record in the light most favorable to the verdict, the government proved at most: (1) a series of GC "THC" numbers reflecting combined native and instrument-created $\Delta^9$-THC; (2) agent and analyst testimony describing those numbers as exceeding 0.3% when (improperly) treated as if they were $\Delta^9$-THC; and (3) evidence that defendants operated in the hemp/cannabis space.

Significantly, the government did not prove that any tested material contained more than 0.3% native $\Delta^9$-THC on a dry-weight basis. Without that showing, the government

failed to establish that the material was "marihuana" rather than lawful "hemp." The resulting convictions rest on (1) an impermissible substitution of "total-THC" for $\Delta^9$-THC, contrary to statutory text and *Loper Bright*, and (2) speculative inferences that collapse once the GC methodology is understood.

Under *Jackson*, *Perez-Melendez*, *Rodríguez-Martínez*, *Lipscomb*, and *Garcia*, that is not enough. The Court must enforce the statutory element as written and enter judgment of acquittal.

## D. The DEA's Administrative Guidance and Testing Regime do not Control

The CSA counts turn on whether the government proved, beyond a reasonable doubt, that the plant material at issue was marijuana, not exempt hemp under the 2018 Farm Bill. That question depends on the meaning of the statutory threshold—a "delta-9 tetrahydrocannabinol concentration of more than 0.3 percent on a dry weight basis"—and on whether the DEA testing method actually measures that statutory element. At trial, the government's proof on that element rested entirely on DEA's adoption of a "total THC"/THCA-inclusive testing regime, derived from USDA hemp-program guidance and DEA interpretive letters, rather than from the statutory text itself. Those agency positions are interpretive only—they do not have the force of law—and they are therefore entitled at most to *Skidmore* deference: weight only to the extent they are persuasive. They are not.

Even accepting the jury's factual determinations, the law governing what must be proven is for the Court, not the jury. Under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the Court must exercise its independent judgment on the meaning of the statute and the weight, if any, owed to DEA's interpretive approach. Because the DEA/USDA "total

THC" regime lacks the "power to persuade" under *Skidmore*, the government's evidentiary showing—built entirely on that regime—was legally insufficient to establish the CSA elements the jury was instructed to find.

The meaning of the hemp carve-out in the CSA and 2018 Farm Bill is a pure question of statutory interpretation. The Supreme Court has now made clear that courts "may not defer to an agency's interpretation of the law simply because a statute is ambiguous." Instead, courts must "exercise their independent judgment" in determining what the statute means and whether the agency's reading is correct. That is the law in the wake of the Court's abandonment of *Chevron*-style mandatory deference.

Thus, on the post-verdict record now before it, this Court cannot treat USDA or DEA's "total THC" statements as binding glosses on the Farm Bill or CSA. At most, those interpretations may be considered under *Skidmore*, which accords weight only "according to the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

The government's theory at trial depended on a chain of non-binding agency materials:

- USDA hemp testing guidelines instructing laboratories to report "total THC" by combining measured $\Delta$9-THC with converted THCA following decarboxylation;

- DEA internal laboratory protocols that adopt post-decarboxylation, "total THC" reporting; and

- DEA opinion letters asserting that THCA "does not meet the definition of hemp" because, once converted, it is equivalent to $\Delta$9-THC and must be counted toward the 0.3% threshold.

None of these were promulgated through notice-and-comment rulemaking. None purports to be a legislative rule. They are, by their own terms, **guidance and internal practice**: exactly the kind of materials that fall within *Skidmore*'s domain.

In deciding the Rule 29(c) motion, therefore, the Court must ask not whether the jury credited the fact of those agency positions, but whether the legal proposition they embody—that the statutory Δ9-THC threshold can be satisfied by a "total THC" value created by lab-induced decarboxylation—is sufficiently persuasive to redefine the element of the offense. It is not.

Under *Skidmore*, several considerations guide the Court's assessment. Each cuts sharply against giving weight to the "total THC" regime in the criminal context of this case.

1. **Conflict with the statutory text.** Congress defined hemp, and thereby limited the reach of the CSA, by reference to "delta-9 tetrahydrocannabinol concentration … on a dry weight basis." It did not refer to "total THC," to THCA, or to the hypothetical amount of Δ9-THC that might result if the plant material were later subjected to a particular heating protocol in a government laboratory.

The DEA/USDA regime, by contrast, counts **converted THCA** toward the threshold and substitutes a **post-decarboxylation measurement** for the actual Δ9-THC concentration present in the seized material. **An interpretation that replaces the statutory metric with a broader, invented one cannot be described as faithful to the text.** Under *Skidmore*, an agency view that rewrites the statute rather than interprets it is not "valid reasoning" and deserves little or no weight.

2. **Lack of thorough statutory and criminal-law analysis.** The "total THC" regime arose in the context of **civil hemp-production compliance**, not criminal prosecution. The guidance documents and letters the government relied on reveal no serious examination of criminal law.

27

That absence of analysis is especially striking given the high stakes of criminal prosecution and the precision of the 0.3% threshold. Under *Skidmore*, such interpretive shortcuts weigh against affording persuasive force to the agency's position, especially when one considers (1) the interaction between the Farm Bill's hemp definition and the CSA's criminal provisions; (2) due process and fair notice concerns raised by expanding criminal liability based on internal lab practice; or (3) the rule of lenity in the face of overlapping hemp/marijuana definitions.

3. **Inconsistency with earlier and contemporaneous understandings.** The move from a Δ9-specific threshold to "total THC" and THCA-inclusive methods is not a long-standing, stable reading of the statute—it is a recent policy choice. Congress itself is now being asked to amend the hemp definition to expressly include total THC and related compounds, which confirms that the current statutory language does not yet say what the agencies are treating it as though it said.

This kind of retrofit—using guidance and lab manuals to achieve, in the short term, what Congress is still debating whether to do in the long term—is precisely the sort of inconsistency and drift that *Skidmore* treats as diminishing persuasive force. Where the legislative branch has not yet made the change, executive branch workarounds are entitled to skepticism, not deference.

4. **Scientific mismatch between the method and the legal element.** The DEA laboratory method at issue does not measure the Δ9-THC content of the material as seized. It deliberately alters the material through heating, converts THCA into Δ9-THC, and then reports the sum as "THC." Whatever one thinks of that approach as a policy tool for agricultural regulation, it is a poor scientific fit for a criminal statute keyed to actual Δ9-THC concentration on a dry-weight basis.

Under *Skidmore*, the "validity of [the agency's] reasoning" includes whether the method reasonably advances the legal standard it purports to implement. Here, the method measures something substantially different from the statutory element and thereby undermines, rather than supports, the persuasiveness of the agencies' interpretation.

Taken together, these factors show that the DEA/USDA "total THC" interpretation fails *Skidmore's* test. It is not a careful, text-driven, long-standing, scientifically congruent reading of the statute. It is a later-developed, policy-driven expansion that oversteps the statutory language and blurs the line between civil compliance management and criminal liability.

**F.      Once the Court Declines to Defer Under Skidmore, the Government's Trial Proof on the CSA Elements Collapses as a Matter of Law**

Recognizing that the jury has returned a guilty verdict on the CSA counts, the Court's Rule 29(c) task is nonetheless a **legal** one: to decide whether, under the **correct statutory standard**, the evidence presented could support that verdict. *Skidmore* requires the Court to make its own judgment about what the statute means and about the weight, if any, owed to DEA's competing view.

If the Court concludes—consistent with the analysis above—that the DEA/USDA "total THC" regime is not entitled to *Skidmore* deference, then the governing legal question is straightforward: did the government introduce evidence that the seized material contained ***more than 0.3% actual Δ9-THC on a dry-weight basis***, measured as such at the time of seizure?

On this record, it did not. All THC numbers presented to the jury were the product of the **non-statutory, post-decarboxylation method** that *Skidmore* tells this Court it need not—and should not—adopt as a gloss on the statute. Once that interpretive scaffold is removed, no legally sufficient evidence remains on the critical CSA element, and the jury's verdict on those counts cannot stand.

Accordingly, even taking the jury's factual findings as they are, the Court's independent application of *Skidmore* compels one conclusion: the government failed, as a matter of law, to prove the CSA elements beyond a reasonable doubt, and the CSA counts must be vacated under Rule 29(c)

Even viewed in the light most favorable to the government, no rational trier of fact could have found beyond a reasonable doubt that the substance in this case was "marijuana" rather than lawful hemp, because the only evidence on that element was the result of a gas-chromatography assay that has never been shown to be scientifically valid for the legal question at issue. At trial, the government's chemist testified that the DEA's GC method for cannabis has been "internally validated" by the agency. That bare assertion is not evidence of scientific reliability and cannot substitute for actual proof that the method is capable of distinguishing hemp from marijuana at the 0.3% Δ9-THC threshold. As the President's Council of Advisors on Science and Technology has made clear, no forensic method can be deemed valid or reliable in the absence of empirical testing that establishes its accuracy and error rates under conditions reflecting its intended use. Experience, tradition, accreditation, and internal approval are not validation. They are self-attestations.

Here, the government offered no empirical validation studies, no error-rate data, no measurement uncertainty, and no testing of known thermal conversion of THCA and CBD into Δ9-THC in the GC inlet. In other words, the record contains no evidence that DEA's GC protocol can accurately classify cannabis samples clustered around the 0.3% legal line, or that it measures native Δ9-THC at all rather than a mixture of plant THC and instrument-created THC. **A conviction cannot rest on a method whose reliability for the dispositive**

**element is taken entirely on faith, particularly where modern forensic standards explicitly warn that such unvalidated methods "lack a scientific foundation."**

Because the government's proof that the substance was "marijuana" consisted solely of this unvalidated GC result and the conclusory assurance that DEA had "internally validated" its own method, the evidence on that essential element is legally insufficient. No rational juror, properly instructed on the requirement of proof beyond a reasonable doubt and the need for scientifically reliable evidence, could find that the government carried its burden. The Court should therefore enter a judgment of acquittal under Rule 29(c) on all counts requiring proof that the substance was marijuana rather than lawful hemp.

## VIII.  RELIEF REQUESTED

For the reasons set forth above, Defendant respectfully requests that the Court:

1.  Grant this renewed motion for judgment of acquittal under Rule 29(c)(2) as to all counts of conviction that depend on proof that the material at issue was "marihuana" under the CSA—specifically Counts 1, 2, and 6–8—and enter judgments of acquittal on those counts;

2. In the alternative, at minimum: (a) vacate the 1,000-kg / 1,000-plant findings associated with Counts 1 and 2, because the government failed to prove that those quantities were "marihuana" rather than hemp under the statutory $\Delta^9$-THC definition; and (b) vacate Counts 6–8, because the government failed to prove that the

31

premises were used for a felony CSA offense rather than for cultivation or processing of federally lawful hemp; and

3.  To the extent any count is not vacated under Rule 29, grant a new trial under Rule 33 in light of the element-mismatch, deference, and sufficiency problems identified above.

Dated: December 9, 2025

Respectfully submitted,

HOLON LAW PARTNERS LLP

By: /s/ Jason H. Ehrenberg
    Jason H. Ehrenberg, Esq. (admitted pro hac vice)
    Eric Postow, Esq. (admitted pro hac vice)
    Holon Law Partners LLP
    1178 Broadway, 3rd Floor #4503
    New York, NY 10001
    Direct: 202.888.3773
    Main: 866.372.0726
    JEhrenberg@HolonLaw.com

By: /s/ Mark Dion
    Mark Dion, Esq.
    Fredette Dion LLC
    254 Commercial Street
    Portland, Maine 04101
    Tel: (207) 318-1004
    dionmark@me.com

**Attorneys for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2025, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notice to all counsel of record.

*/s/ Jason H. Ehrenberg*
Jason H. Ehrenberg