UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUCAS SIROIS, et al., | No. 1:21-cr-00175-LEW |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**

The government files this response in opposition to defendant Lucas Sirois's motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("FRCP") 29, and for a new trial pursuant to FRCP 33. Dkt. 713, 714.[1] In his motions, the defendant urges this Court to set aside the jury's guilty verdict as to all counts involving violations of the CSA, and to grant a new trial as to those counts, essentially on the grounds that the testing protocol utilized by the Drug Enforcement Administration ("DEA") is insufficient as a matter of law to distinguish illegal marijuana from legal hemp. This Court has already considered the lion's share of the same arguments raised by the defendant *in limine* and correctly rejected them. Dkt. 673 at 7 (precluding the defendant's expert from testifying that "the law requires the Government to perform particular tests (*i.e.*, quantitative analysis) or to prove each sample's actual delta-9 THC concentration on a dry weight basis (as opposed to proof that such concentration *exceeds 0.3 percent*)" because such opinion would be "inaccurate and misleading."). As has the jury: in reaching its verdict, it heard extensive testimony from the defendant's expert detailing his concerns about the sufficiency of the marijuana testing protocol

---

[1] In the interest of judicial economy, the government files this consolidated response to the defendant's two motions.

used in this case, which it reasonably rejected in light of contravening testimony from six DEA chemists. This Court should decline the defendant's invitation to overturn the jury's sound judgment in favor of his own.

### A. Legal Standard

Rule 29 provides that the defendant may move the Court to enter a judgment of acquittal following the close of all evidence if "the evidence is insufficient to sustain a conviction." In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). All permissible inferences must be drawn in the government's favor. *Id*. The ultimate question that the court must answer in assessing whether Rule 29 relief is appropriate is whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. Put another way, the Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Curley v. United States*, 160 F.2d 229, 232 (D.C.Cir. 1947). The Court must be careful not to substitute its own judgment for that of the jury: in fact, if the Court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *Id*. at 233.

Rule 33 provides that the Court may vacate any judgment and grant a new trial "if the interest of justice so requires." This remedy is "sparingly used" only when there would be a "miscarriage of justice" and where "the evidence preponderates heavily against the verdict." *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979); *see also United States v. Felice*, 481 F.Supp. 79, 90 (N.D. Ohio 1978) ("Although it has been

said that, in considering such a motion, the trial judge sits as a 13th juror, the discretion of the court should be exercised with caution, and the power to grant a new trail on this ground should be invoked only in an exceptional case[.]") (internal citation omitted).

The defendant was convicted at trial of conspiring to distribute controlled substances, including in excess of 1000 kilograms or 1000 marijuana plants, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Count One); and possession with intent to distribute controlled substances, including in excess of 1000 kilograms or 1000 marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) (Count Two). The defendant's shell companies, Lakemont LLC, Sandy River Properties LLC, and Spruce Valley LLC, were each convicted of maintaining a drug premises, in violation of 21 U.S.C. § 856 (Counts Six, Seven, and Eight).

### B. Facts Proven at Trial

At trial, the government proved beyond a reasonable doubt that the defendant, his coconspirators, and his shell companies, agreed to, and did, cultivate, distribute, and possessed with intent to distribute massive amounts of marijuana across multiple locations over an approximately four-year period. Many of the defendant's coconspirators, who had previously pleaded guilty for their role in the scheme, testified at trial, including David Burgess, Brandon Dagnese, Alisa Sirois, and immunized coconspirator William Brey. Each testified that the defendant cultivated and sold high grade marijuana, the best that he could grow, and that substantially all of his income resulted from the sale of marijuana. For example, Burgess, the defendant's financial advisor, testified that the defendant was in the marijuana business, Tr. Vol I 58, that he oversaw "pretty much everything," Tr. Vol I 59, that Burgess's primary responsibility at the defendant's grow facility in Farmington was to "watch cash flow;" that he kept

between 300,000 and 800,000 dollars in cash in shoe boxes at any given time, Tr. Vol I 61, that the cash was the proceeds of marijuana sales, Tr. Vol I 61, and that he was afraid to count that cash at the defendant's house, and instead kept it at his own home in a safe, because "you hear stories about out in the west that people are trying to rob people selling [marijuana] and steal the cash," Tr. Vol I 65. Burgess was clear that "the only product that was sold by the Shoe Shop" was marijuana, as far as he knew. Tr. Vol I 65.

That testimony was corroborated by each witness, including by the defendant's black market courier, Brandon Dagnese, who testified that beginning around 2018, Dagnese "couldn't get enough marijuana" to resell to midlevel marijuana dealers in Massachusetts and Connecticut, until he was introduced to the defendant by a mutual acquaintance. Tr. Vol III 73-74. Dagnese would meet the defendant weekly in a "salt shed" "down a long dirt road" where he would "give him a bunch of cash and put a bunch of marijuana in [his] truck" before heading south. Tr. Vol III 74-75. The defendant sold Dagnese between 30 and 70 pounds of marijuana per week for between $1000 and $1400 per pound over a period of years. *Id.* Dagnese estimated that the total dollar value of their marijuana transactions was between $1 and $1.5 million. Tr. Vol III 75.

Each coconspirator was asked whether the defendant grew and sold hemp. Dagnese's testimony was typical of their responses: Dagnese "wasn't in [the hemp] business." Tr. Vol III 79. He "couldn't sell hemp, [because he] basically would be ripping off my guys." *Id.* Dagnese was clear: "I've never sold that in my life." *Id.* If he had passed along hemp that he had purchased from the defendant unknowingly, "whoever purchased [it] would definitely want their money back and – or who knows. They definitely wouldn't be happy, that's for sure." *Id.*

4

The jury heard from DEA Task Force Officer Jonathan Richards that on July 21, 2020, the DEA and their law enforcement partners executed a number of search warrants on properties controlled by, and associated with, the defendant, including on the defendant's primary industrial marijuana grow at 374 High Street in Farmington, known as the Shoe Shop. Tr. Vol I. 128-129. The jury saw video evidence taken by DEA investigators showing hundreds of marijuana plants growing at the Shoe Shop, and at a second industrial facility, 105 Avon Valley Road, in Avon. On July 21, 2020, the DEA seized 1805 plants from the Shoe Shop and 1189 plants from 105 Avon. Tr. Vol I 168, 180. The jury heard from Officer Richards that he followed the DEA's protocols and collected random samples of finished marijuana and marijuana plants from throughout these facilities, which samples were sent to DEA's Northeast Laboratory for analysis. Tr. Vol I 153-156.

The government called six chemists who analyzed over 21 boxes of plant material and finished marijuana seized from the Shoe Shop and 105 Avon. Among those chemists was Quality Assurance Specialist Adriana DiLalla, who testified that she was a forensic scientist who was an expert at identifying controlled substances, that she had been recognized as an expert on at least nine previous occasions when she testified in federal court, and that she had performed more than 2500 examinations of suspected controlled substances over 11 years at the Northeast Laboratory. Tr. Vol I 218-220. DiLalla detailed the testing methodology that she and her fellow chemists performed on the plant material seized in this case, explaining that, among other tests, the DEA performed GC/MS testing on the representative samples in order to compare the abundance of delta-9 THC in the plant material to a known internal standard, so as to determine whether the plant sample contained less than or greater than 1% delta-9 THC

by volume. Tr. Vol I 222. DiLalla explained to the jury that the DEA's protocol was conservative "and err[ed] on the side of caution" by setting the benchmark at 1% concentration, more than three times the 0.3% level required by law to classify cannabis as marijuana. Tr. Vol I 222-223. DiLalla was clear that the DEA's protocol did not quantify the exact amount of THC in a sample, it simply measured the ratio between delta-9 THC present and the internal standard: if the ratio was greater than one, the chemists could identify the substance as marijuana; if it was less than one, the chemists would report the result as inconclusive. Tr. Vol. I 223. The DEA developed this test in 2019 in response to the passage of the 2018 Farm Bill specifically to address the new standards set by Congress for the identification of marijuana. Tr. Vol II. 256.

   DiLalla testified that the DEA's marijuana testing methodology had been validated by scientists at DEA's special testing and research laboratory in Dulles, Virginia. Tr. Vol I 224. The method had been subject to "extensive testing and it has showed that the method works the way that it was intended and designed to work." *Id*. In particular, the method had been tested for repeatability, reproducibility, accuracy, and ruggedness, among other things. Tr. Vol I 225. On direct and again on cross examination, DiLalla acknowledged that there was a possibility that CBD might be converted to delta-9 THC during testing, but that DEA scientists had not seen that occur in laboratory conditions, and that during validation, that possibility was interrogated and solved for. Tr. Vol II 255. DiLalla was also clear that the DEA's testing methodology was designed to test for the delta-9 THC concentration in all parts of the cannabis plant, to include any acids (e.g., THCA) consistent with the CSA and the 2018 Farm Bill. Tr. Vol II 254-55.

In total, the government presented 18 lab reports that described the testing of 224 representative samples of plant material. Of those, 172 tested positive for marijuana, meaning they had a delta-9 THC concentration in excess of 1%, a 76% positivity rate. Extrapolating that out to the roughly 1800 plants seized from the Shoe Shop, according to the DEA's testing methodology and statistical analysis, 1368 plants at the Shoe Shop on July 21, 2020, were marijuana plants. Tr. Vol V 927-28.

### C. The Jury's Verdict was Reasonable

The conspiracy as charged described a course of conduct that occurred over approximately a four-year period, and generated millions of dollars in revenue, including in excess of $4 million in cash deposited in Lakemont LLC's operating account at Franklin-Somerset Federal Credit Union. G.Ex. 360. Testimony by the defendant's coconspirators established that substantially all of this revenue was derived from the sale of marijuana—not hemp—and that typically, marijuana was sold for between $1000 and $1400 per pound. This jury could have concluded beyond a reasonable doubt based *solely* on coconspirator testimony, the Lakemont bank records, and some extremely conservative math, that the conspiracy involved in excess of 1000 kilograms of marijuana or 1000 marijuana plants (e.g., $4,000,000 divided by $1000 = 4000 pounds of marijuana = 1,814 kilograms of marijuana). And those numbers fail to take into account an additional $2.5 million in revenue reflected in the Lakemont account during the conspiracy period, as well as all revenue generated by 105 Avon, and other evidence of drug quantity. Drug conspiracy cases do not require drugs on the table for conviction. *See, e.g., United States v. Cruz-Rodriguez*, 541 F.3d 19, 27-28 (1st Cir. 2008) ("That the government did not present physical evidence that [defendant] dealt drugs . . . is not dispositive—it did not need to do so in order to secure a conviction"); *see also*

*United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir. 2005) ("Lack of physical evidence does not render the evidence that is presented insufficient."); *United States v. DeCologero*, 530 F.3d 36, 65 (1st Cir. 2008) (evidence may be sufficient to convict even if it is entirely circumstantial).

Here though, the jury had drugs on the table. Lots of drugs. Thousands of marijuana plants and hundreds of pounds of finished marijuana. They had 172 samples of cannabis that tested positive for marijuana, and statistical analysis extrapolating that number out to more than 1300 confirmed marijuana plants in the Shoe Shop alone on one day in July 2020. And that was one day, at one location, in a years-long conspiracy involving multiple grow sites.

The defendant argues that all of this evidence is inadequate for conviction of the CSA counts because the DEA's marijuana testing protocol is insufficient as a matter of law to distinguish marijuana from hemp, and therefore a new trial is required. The defendant's arguments are the same ones they made to this Court *in limine* (which it properly rejected) and to the jury at trial: the testing is inadequate because it does not provide a quantitative measure of delta-9 THC; the testing is inadequate because other methods are available that are preferred; the testing is inadequate because it was not peer reviewed; the testing is inadequate because it also measures delta-9 THC present in THCA. The jury heard these arguments through cross examination and through the expert testimony in the defendant's case-in-chief, and like the Court did *in limine*, it rejected them.

To the extent that the defendant presents any new argument in the instant motions, it is an administrative law argument: in light of recent Supreme Court jurisprudence, agency interpretation of its own statutory framework is not deserving of

8

deference; therefore, DEA's interpretation of what is required to distinguish hemp from marijuana should be disregarded by this Court in favor of the defendant's views, which happen to support his acquittal. To the extent not already addressed in the pretrial motions *in limine*, this issue is simply not properly before the Court in this posture. The argument advanced by the defendant here is purely legal and therefore should have been made as a Rule 12 motion or a motion *in limine*.[2] It should not appear before the Court for the first time in Rule 29 and 33 motions after the jury has considered the evidence and reached its verdict, especially when, as here, the argument was available to defendant and never made. *Cf. United States v. Leon-Lopez*, 891 F. Supp. 138, 148-49 (S.D.N.Y. 1995) (denying defendants' motions for acquittal and a new trial, in part on the grounds that the "new" evidence raised by defendants in their motion was already known to them during the pendency of the trial and citing *United States v. Spencer*, 4 F.3d 115, 119 (2d Cir. 1993), for the proposition that "new" evidence requiring acquittal in the Rule 29 context is evidence that "could not have been discovered, in the exercise of due diligence, before or during trial, and that the evidence is so material and noncumulative that its admission would probably lead to an acquittal.")

---

[2]  In his Rule 33 motion, the defendant erroneously describes the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), as providing a "post-verdict doctrinal clarification[.]" Dkt. 714 at 2. In fact, *Loper Bright* was decided in June 2024, predating the verdict in this case by more than a year.

**D. Conclusion**

For the reasons stated above, the Court should deny the defendant's motions for judgment of acquittal and for a new trial.

Dated: December 23, 2025                    ANDREW B. BENSON
                                            United States Attorney


                                     By:    /s/Noah Falk
                                            Noah Falk
                                            Assistant U.S. Attorney
                                            U.S. Attorney's Office
                                            100 Middle Street
                                            Portland, Maine 04101
                                            (207) 780-3258
                                            Noah.Falk@usdoj.gov

                                            /s/ Andrew McCormack
                                            Andrew McCormack
                                            Assistant United States Attorney
                                            202 Harlow Street
                                            Bangor, ME 04401
                                            (207) 945-0373
                                            Andrew.MacCormack@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, I electronically filed **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL** with the Clerk of Court using the CM/ECF system which will send notifications of such filing to all counsel of record.

                          ANDREW B. BENSON
                          United States Attorney

By:    */s/ Noah Falk*
        Noah Falk
        Assistant United States Attorney
        U.S. Attorney's Office
        100 Middle Street
        Portland, ME  04101
        (207) 780-3257
        Noah.Falk@usdoj.gov