UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:21-cr-00175-LEW |
| ) | |
| LUCAS SIROIS, et al., ) | |
| ) | |
| Defendants ) | |

**ORDER ON DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL**

Defendants Lucas Sirois, Lakemont LLC, Sandy River Properties LLC, and Spruce Valley LLC have made the instant Motion for Judgment of Acquittal ("Rule 29 Mot.," ECF No. 713) and Motion for New Trial ("Rule 33 Mot.," ECF No. 714) following the jury's return of guilty verdicts on all counts at the conclusion of a five-day trial.[1] In these motions, the Defendants ask for the jury's verdict to be set aside as to the counts charging violations of the Controlled Substances Act (CSA). Counts One and Two of the Superseding Indictment charged Defendant Lucas Sirois with conspiracy to distribute marijuana (in quantities exceeding 1,000 kilograms or 1,000 plants) and with possession intending to distribute the same.[2] Counts Six, Seven, and Eight charged Lakemont LLC, Sandy River

---

[1] Defendant Robert Sirois is represented separately and has not joined these motions.

[2] Defendant Lucas Sirois was also found guilty of bank fraud, tax evasion, and conspiracy to defraud the United States (Counts Three, Four, and Five), but has not challenged the jury's verdict as to those counts. *See* Rule 29 Mot. at 1; Rule 33 Mot. at 1.

1

Properties LLC, and Spruce Valley LLC (the "Corporate Defendants") with maintaining drug involved premises. For the reasons below, both motions are DENIED.

## STANDARDS

Under Rule 29 of the Federal Rules of Criminal Procedure, the Court "may set aside the verdict and enter an acquittal" for "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(c)(2), (a). To make this determination, the question before me is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," considering the evidence presented at trial in the light most favorable to the jury's verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." *United States v. Vázquez-Soto*, 939 F.3d 365, 371 (1st Cir. 2019) (citation and emphasis omitted).

Rule 33, on the other hand, provides that the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). While a district court may have "greater power to order a new trial than to overturn a jury's verdict through a judgment of acquittal," this remedy "must be used sparingly and only where a miscarriage of justice would otherwise result." *United States v. Alarcón Rodríguez*, 789 F. Supp. 3d 164, 169-70 (D.P.R. 2025) (quoting *United States v. Newbert*, 532 F. Supp. 2d 200, 202 (D. Me. 2008), then *United States v. Del Valle*, 566 F.3d 31, 38 (1st Cir. 2009)).

Because both of Defendants' motions contain similar and overlapping arguments, I address both motions together below.

## ANALYSIS

A.     **Marijuana vs. Hemp**

Defendants primarily argue that the Government failed to prove that the substance involved in their conduct was marijuana and not hemp because of insufficiencies in the DEA's testing procedures. In the alternative, Defendants argue that these insufficiencies render the verdict a miscarriage of justice that warrants a new trial.

Following the passage of the 2018 Farm Bill, "marijuana" is defined under the CSA as cannabis that contains greater than 0.3 percent delta-9 THC, while cannabis containing not more than 0.3 percent delta-9 THC is "hemp."[3]  *See* 21 U.S.C. § 802(16); 7 U.S.C. § 1639o(1). The DEA's testing procedures use gas chromatography to detect and report delta-9 THC when it is present in a given sample at a concentration greater than one percent. As the Government summarized in its closing, the jury had before it 18 reports on results of DEA laboratory testing performed on 224 samples of seized suspected drugs. *See* Tr. Vol. V 927:7-12 (ECF No. 710); Gov't Ex. Nos. 181-249. Of those samples tested, 172 (or approximately 76%) indicated positive for marijuana. *See id*.

Defendants' chief complaint is that there is some risk that, when a cannabis sample is heated to certain temperatures, cannabidiol (CBD) and, more significantly, THC acid (THCA) that may be present in that sample could convert into delta-9 THC, which could then increase the delta-9 THC levels that the test itself registers. *See* Rule 29 Mot. at 6-10,

---

[3] The fact that the exemption of hemp from the CSA definition of marijuana only became the law in 2018—two years into the conspiracy described in the Superseding Indictment—has so far gone unmentioned.

13-15; Rule 33 Mot. at 4-15.  Defendants refer to this metric—the post-decarboxylation delta-9 THC level—as "total THC" or "potential THC."  *See also* 7 C.F.R. § 990.1 (defining "Total THC" as "the value determined after the process of decarboxylation, or the application of a conversion factor if the testing methodology does not include decarboxylation, that expresses the potential total delta-9 [THC] content derived from the sum of the THC and THCA content and reported on a dry weight basis").  This is the metric that the DEA's testing procedures were designed to capture.  *See* Tr. Vol. II. 254:11-255:3 (ECF No. 706).[4]  Defendants argue that because the DEA's test measures "total THC," that test does not prove that the substance tested is marijuana for purposes of the CSA.

As an initial matter, I am not convinced by Defendants' construction of the statutory definition of marijuana to exclude delta-9 THC that is the result of decarboxylative testing methods.  "[W]e focus on the plain meaning of the whole statute, not of isolated sentences or phrases.  Words in a statute are not islands but must be read in their context and with a view to their place in the overall statutory scheme."  *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2021) (cleaned up).  The definition of marijuana in the CSA excludes

---

[4] DEA Quality Assurance Specialist Adriana DiLalla testified that the DEA's test "measure[s] the total amount of delta-9 THC to include THCA," which "decarboxylates . . . through the instrumentation process," but maintained that she has not seen CBD convert to THC in her laboratory as a result of the testing methodology, and that CBD conversion did not compromise the accuracy of the testing methodology when it was validated. Tr. Vol. II. 254:11-256:10 (ECF No. 706).  The Government has previously suggested that the DEA's methodology was designed to meet the requirements of U.S. Department of Agriculture regulations for testing within domestic hemp production programs.  *See* Mot. to Preclude Argument on THCA Conversion at 1-2 (ECF No. 680); *see also* 7 C.F.R. § 990.25(g) ("At a minimum, analytical testing of samples for total THC must use post-decarboxylation or other similarly reliable methods approved by the Secretary.  The testing methodology must consider the potential conversion of THCA in hemp into THC and the test result must reflect the total available THC derived from the sum of the THC and THCA content.  Testing methodologies meeting the requirements of paragraph (g) include, but are not limited to, gas or liquid chromatography with detection.").

hemp as defined in 7 U.S.C. § 1639o (that is, cannabis with a delta-9 THC concentration that does not exceed 0.3 percent).[5]  *See* 21 U.S.C. § 802(16)(B)(i), 7 U.S.C. § 1693o(1). In the sections of the 2018 Farm Bill that immediately follow this definition of hemp, Congress specifically required "a procedure for testing, *using post-decarboxylation or other similarly reliable methods*, delta-9 tetrahydrocannabinol concentration levels of hemp."  *See* Agriculture Improvement Act of 2018, Pub. L. 15-334, §§ 297B(a)(2)(A)(ii), 297C(a)(2)(B), 132 Stat. 4490, 4908-09 (emphasis added) (codified as 7 U.S.C. §§ 1639p(a)(2)(A)(ii), 1639q(a)(2)(B)).  Because delta-9 THC concentration can only be ascertained through testing, which the 2018 Farm Bill expressly contemplates—indeed, requires—be accomplished with "post-decarboxylation" methods, it seems to me that the 0.3 percent threshold described in Section 1639o(l) is best read to refer to delta-9 THC concentration following testing "using post-decarboxylation . . . methods."  *Id*.  I therefore disagree with Defendants' contention that the DEA's methodology is legally insufficient to differentiate between marijuana and hemp under the CSA because it measures delta-9 THC concentration post-decarboxylation (to include that which is THCA-derived).[6]

---

[5] The CSA defines "marijuana" as "all parts of the [cannabis] plant," its "seeds" and "resin," "and every compound, manufacture, salt, derivative, mixture, or preparation" of the plant, seeds, or resin.  21 U.S.C. § 802(16)(A).  It further specifies that marijuana does not include "hemp," *id*. § 802(16)(B)(i), which is defined as "the [cannabis] plant," its "seeds," and "all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers . . . with a delta-9 tetrahydrocannabinol [THC] concentration of not more than 0.3 percent on a dry weight basis," 7 U.S.C. § 1639o(1).

[6] Defendants argue that lenity demands capitulation to their construction of the statutory definitions.  But "the rule of lenity rarely comes into play," because under "longstanding precedents," the rule of lenity only applies "when a court employs all of the traditional tools of statutory interpretation and, after doing so, concludes that the statute still remains grievously ambiguous, meaning that the court can make no more than a guess as to what the statute means."  *Shular v. United States*, 589 U.S. 154, 167-68 (2020) (Kavanaugh, J., concurring); *see also United States v. Dion*, 37 F.4th 31, 39 (1st Cir. 2022) (Lenity "applies when a criminal statute contains a grievous ambiguity or uncertainty, and only if, after seizing everything from which aid can be derived, a court can make no more than a guess as to what Congress intended. . . .

In addition to the heat conversion issue, Defendants complain that the DEA's methodology (1) does not measure delta-9 THC concentration on a dry-weight basis, (2) uses a one percent qualitative cutoff (instead of 0.3 percent), and (3) was not peer-reviewed or validated. Defendants also point to testimony at trial indicating that the DEA chemists had access to liquid chromatography, which can test samples without heating them, but did not use this instrument to test for marijuana. *See*, *e.g.*, Tr. Vol. II 365:5-25 (ECF No. 706). None of this amounts to reasonable doubt. With respect to the first complaint, it seems to me that this aspect of the methodology actually cuts in a defendant's favor because, as a matter of logic, drying a sample would only increase its delta-9 THC concentration. With respect to the second, proof that a tested sample's delta-9 THC concentration is greater than one percent is also proof that its delta-9 THC concentration is greater than 0.3 percent. And for the reasons stated in my order denying Defendants' *Daubert* motion, I do not agree that the DEA's methodology was not reliable or sufficiently validated, so as to necessitate setting the jury's verdict aside.[7] *See* Order on Motions in Limine at 12-15 (ECF No. 673). Finally, the availability of alternative testing methodologies does not make the results of the tests that were performed insufficient to prove Defendants' guilt or establish that the trial they received was unfair.

---

[A] 'grievous ambiguity' requires more than the simple existence of some statutory ambiguity.") (citations and quotations omitted). Where, as here, "'text, context, and structure' decide the case," lenity has no role. *Bondi v. VanDerStock*, 604 U.S. 458, 484 (2025) (citation omitted).

[7] In addition, DEA Quality Assurance Specialist DiLalla testified at trial to the steps that have been taken to assure the accuracy and reliability of the methodology. *See, e.g.,* Tr. Vol. I 224:7-225:23 (ECF No. 705); Tr. Vol. II 255:4-256:10 (ECF No. 706).

Defendants had a full and fair opportunity to present their case on these points to the jury at trial. In advance of trial, I ruled that the DEA's testing procedures were sufficiently reliable for use at trial, but that Defendants would be free to argue their qualms with these procedures to the jury. *See* Order on Motions in Limine at 12-15. At trial, Defendants were afforded wide latitude to probe flaws in the DEA's testing, including those inherent to the gas chromatograph's application of heat. I denied the Government's requests to exclude Defendants' scientific expert, *see id.* at 5-8, and to preclude questioning and argumentation about THCA conversion, *see* Tr. Vol. II 244:10-245:13 (ECF No. 706). The definition of marijuana on which I instructed the jury did not foreclose those arguments, either.[8] *See* Tr. Vol. V 1010:10-1011:12 (ECF No. 710). Defendants, through the rigorous cross-examination of the DEA witnesses, the testimony of their subject matter expert, and opening and closing arguments, placed the trustworthiness of the DEA's testing methodology squarely before the jury. The jury rejected those arguments.

Considering the evidence in the light most favorable to the verdict, I cannot conclude that no rational jury would have been able to find beyond a reasonable doubt that the substance involved in the Defendants' conduct was marijuana. Nor can I say that

---

[8] I instructed the jury that "[m]arijuana . . . does not include hemp," that "[t]he term 'hemp' means the cannabis plant and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 THC concentration of not more than 0.3 percent on a dry weight basis," and that "[o]nly cannabis exceeding this delta-9 THC threshold is the controlled substance marijuana." *See* Tr. Vol. V 1011:6-12 (ECF No. 710). If the jury instructions could have been clearer on this point, however, that operated to Defendants' benefit: Defendants took full advantage of any gap in these instructions in their attempts to persuade the jury that it should disregard the lab results because gas chromatography converts THCA into delta-9 THC.

Defendants' concerns about the DEA's procedures, which were allowed to be presented to the jury in abundant detail and which were in fact so presented, warrant a new trial.

**B.     Drug Quantity**

The jury also determined that Defendant Lucas Sirois was responsible for more than 1,000 kilograms of marijuana or more than 1,000 marijuana plants, with respect to the conduct charged at Counts One and Two.  I also cannot conclude that the evidence was insufficient to allow a reasonable jury to make this quantity determination.

At trial, the jury heard that law enforcement executed search warrants at two facilities—374 High Street (the "Shoe Shop") and 105 Avon Street—on July 21, 2020. From the Shoe Shop facility alone, officers seized 1,805 suspected marijuana plants.[9] The jury heard that law enforcement collected representative samples of plant matter from each grow room in accordance with DEA policy and procedure, which were then sent to the DEA's Northeast Laboratory for testing.  *See* Tr. Vol. I 151:4-161:19 (ECF No. 705) (DEA Special Agent Richards describing process for sample collection from the Shoe Shop).  The DEA tested 171 samples of plant matter seized from the Shoe Shop.  Of those, 127 samples tested positive for marijuana, while the results for 44 samples were inconclusive.[10]

---

[9] An additional 1,189 plants were seized from the facility on Avon Street, although testimony at trial called into question the extent to which Lucas Sirois was personally involved with that facility or the plants grown there by July 21, 2020.  *See, e.g.,* Tr. Vol. II 457:15-458:2, 472:24-474:5 (ECF No. 706).

[10] *See* Tr. Vol. I 163:14-168:22 (ECF No. 705) (DEA Special Agent Richards identifying exhibits seized from the Shoe Shop); Gov't Ex. No. 181 (Lab report for DEA Ex. 82, indicating marijuana present in 22 of 22 samples of plant matter tested); Gov't Ex. No. 184 (Lab report for DEA Ex. 93, indicating marijuana present in 1 sample of plant matter tested); Gov't Ex. No. 211 (Lab report for DEA Ex. 81, indicating marijuana present in 7 of 7 samples of plant matter tested); Gov't Ex. No. 214 (Lab report for DEA Ex. 83, indicating marijuana present in 22 of 22 samples of plant matter tested); Gov't Ex. No. 221 (Lab report for DEA Ex. 88, indicating marijuana present in 4 of 28 samples of plant matter tested); Gov't Ex. No. 231 (Lab report for DEA Ex. 90, indicating marijuana present in 8 of 28 samples of plant matter tested); Gov't

Although not all of the representative samples that were tested indicated positive for marijuana, enough did to support the conclusion that more than 1,000 of the 1,805 plants seized from the Shoe Shop were marijuana.[11] Defendants have not shown that no reasonable jury would be able to conclude from this evidence that Lucas Sirois possessed more than 1,000 marijuana plants on about July 21, 2020, as charged at Count Two.

The record contains even more evidence to support the jury's quantity determination with respect to the conspiracy count, which encompassed a period of years. Alisa Sirois, for example, estimated that between 2016 and 2019, the Shoe Shop facility's eight grow rooms each contained six or so plants, yielding 0.5 to 1.5 pounds of marijuana per week each—24 to 72 pounds per week total. Tr. Vol. III 35:6-22 (ECF No. 708). Another coconspirator, David Burgess, estimated that the facility's eight grow rooms contained seven plants, yielding 1.2 to 1.5 pounds per week each, or approximately 75 to 80 pounds per week total. Tr. Vol. I 73:3-10 (ECF No. 705). And Brandon Dagnese testified that he alone purchased an estimated 30 to 70 pounds of marijuana from Lucas Sirois per week, starting in 2018.[12] Tr. Vol. III 73:22-74:24 (ECF No. 708). Even by the most conservative

---

Ex. No. 234 (Lab report for DEA Ex. 91, indicating marijuana present in 28 of 28 samples of plant matter tested); Gov't Ex. No. 244 (Lab report for DEA Ex. 79, indicating marijuana present in 15 of 15 samples of plant matter tested); Gov't Ex. No. 247 (Lab report for DEA Ex. 84, indicating marijuana present in 20 of 20 samples of plant matter tested).

[11] Applying the 74 percent positivity rate from the tested samples would suggest that 1,200 to 1,400 of the 1,805 plants seized from the Shoe Shop were marijuana.

[12] Even if Dagnese was not, as Defendants argue, the most credible witness, such considerations have no place in my assessment of the sufficiency of the evidence, where I must view the evidence in the light most favorable to the verdict. *See United States v. Huertas*, 148 F.4th 1, 33 (1st Cir. 2025) ("[A] defendant cannot win a sufficiency-of-the-evidence challenge by claiming . . . the witnesses against him were not credible")

estimate permitted by this testimony, assuming a weekly yield of 24 pounds (or between 10 and 11 kilograms), the Shoe Shop alone would have produced more than 2,000 kilograms over the four years of the conspiracy.[13] Even by the most conservative measure, the evidence was more than sufficient to allow the jury to conclude beyond a reasonable doubt that Lucas Sirois was responsible for a quantity of marijuana exceeding 1,000 kilograms over the course of the conspiracy charged in Count One.

### C. Improper Closing Arguments

Defendants also raise remarks that the Government made during closing arguments that they maintain were improper. First, during closing, the prosecutor discussed the DEA methodology's one-percent threshold with the jury, telling them that one percent is "3 times the legal limit" and "a 300 percent difference," and that as a result, "when the lab says that a sample is marijuana, it's not a close call." Tr. Vol. V 926:14-20 (ECF No. 710). Then, approaching the end of his rebuttal nearly four hours later, the prosecutor turned to the issue of THCA conversion. After reiterating the definition of hemp from Section 1639o(1), the prosecutor displayed an excerpt from the U.S. Department of Agriculture's regulations governing hemp production and read portions of the regulatory language pertaining to testing methodologies out loud, arguing that the DEA's procedures were properly designed

---

(citation omitted). Defendants had ample opportunity on cross-examination to illuminate Dagnese's deficiencies as a witness for the jury.

[13] With a weekly yield of 70 pounds (or 31-32 kilograms) per week—which, based on the testimony of these coconspirators, would have been a reasonable appraisal for the jury to adopt—that estimate rises to well over 6,000 kilograms.

to measure "total THC."[14]  *See* Tr. Vol. V 999:5-1000:1 (ECF No. 710); *see also* 7 C.F.R. 990.3(a)(3).

Defendants argue that the Government misstated the legal standard to the jury, inviting conviction based on "total THC."  Rule 29 Mot. at 11-12, 16-17; Rule 33 Mot. at 14-15, 16-17; Reply at 5-6.  This argument, as I understand it, does not bear upon the sufficiency of the evidence.  How the Government characterized the law to the jury has nothing to do with whether there is sufficient evidence in the record to support the verdict or not.  But improper closing arguments may warrant a new trial.  As explained below, I do not believe that is the case here.

Defendants' only contention with respect to the Government's argument is that it invited the jury to convict under the wrong legal standard, and the Government has not deigned to respond to that contention.  The Government's decision on rebuttal to provide the jury with law that the Government knew would not be precisely concordant with my

---

[14] Specifically, the prosecutor told the jury:

> So look at this language from the Farm Bill.  The first piece of the CFR that's quoted here says, "The testing methodology must consider the potential conversion of THCA in hemp into THC, and the test results must reflect the total available THC derived from the sum of the THC and THCA content.  Testing methodologies meeting the requirements of this paragraph include but are not limited to gas or liquid chromatography."  So the Farm Bill is saying that what is hemp includes that THCA.  That THCA needs to be measured for its potential delta-9 THC content.  That's the Farm Bill.  Total THC is the value determined after the process of decarboxylation.  That expresses the potential for delta-9 THC content derived from the sum of the THC and THCA content and reported on a dry weight basis.  The bill defines what hemp is.  DEA's job is to make sure that what they have isn't hemp, that it's marijuana.  The testing was developed in order to do that.  It's not an oversight.  It's not something that could just happen and fall out of the sky.  It was part of the calculus when they put this method together.

Tr. Vol. V 999:5-1000:1 (ECF No. 710).

final instructions to the jury can only be described as curious.[15] When a prosecutor has made an improper argument, the trial court must determine whether, "given the totality of the circumstances, the contested prosecutorial conduct 'so poisoned the well that the trial's outcome was likely affected,'" considering (1) the severity of the misconduct, (2) the context in which it occurred, (3) the administration and likely effect of curative instructions, and (4) the strength of the evidence against the defendants. *United States v. Belanger*, 890 F.3d 13, 34 (1st Cir. 2018) (citation omitted). Neither the Government nor Defendants have argued from this standard. Nonetheless, these factors have guided my consideration of the Government's conduct here, in light of the following observations.

First, the Government did not conceal its plan to "argue from the text of the law in its summation," and Defendants were afforded multiple opportunities to object. Mot. to Preclude Argument on THCA Conversion at 2 (ECF No. 680); *see also* Tr. Vol. IV 806:18-24 (ECF No. 709). Defendants affirmatively stated they did not object and maintained that position until after the jury had retired to its deliberations. *See* Resp. to Mot. to Preclude Argument on THCA Conversion at 8-9 (ECF No. 681); Tr. Vol. IV 807:1-5 (ECF No. 709); Tr. Vol. V 1035:14-1036:11 (ECF No. 710). Nor did Defendants contemporaneously object to the Government's characterization of the testing methodology's one percent decision point. *See United States v. Sepulveda*, 15 F.3d 1161, 1186 (1st Cir. 1993) ("Although excessive summations may on rare occasions constitute plain error, redressable after the fact notwithstanding a contemporaneous objection, . . . a criminal defendant who believes

---

[15] The parties received the final jury instructions well in advance of closing arguments.

12

that a prosecutor's closing argument goes too far must usually object to the offending statements when and as they are uttered."); *Belanger*, 890 F.3d at 35 ("The fact that [the defendant's] attorney did not object to the [prosecutor's] articulation [of the legal standard] below certainly seems to suggest that the remarks were not seen at the time as being erroneous or prejudicial. . . . [A]t the very least, we cannot conclude that the remarks were 'severe.'").

Moreover, during his closing argument, the prosecutor warned the jury that "[t]he Court's instructions control," and that "[i]f anything I say doesn't match up with what the Court tells you later," to "rely on the Court's instruction." Tr. Vol. V 913:17-21 (ECF No. 710). And I instructed the jury that they "must apply the law as I give it to [them]," because "[t]he determination of the law is my duty as the presiding judge in this court," before instructing the jury on the statutory definitions of hemp and marijuana. Tr. Vol. V. 1002:10-12, 1010:10-1011:12 (ECF No. 710). "Our law assumes that jurors follow jury instructions and thus that they followed the judge's, not counsel's, definition," to the extent there were differences between the two. *Belanger*, 890 F.3d at 35 (citation omitted); *see also United States v. Gonzalez-Perez*, 778 F.3d 3, 20-21 (1st Cir. 2015) (noting that "the district court gave specific instructions as to what both criminal intent and reasonable doubt mean," and "we ordinarily presume that juries follow instructions").

Perhaps most importantly, I am not convinced that what the prosecutor told the jury about the 2018 Farm Bill's definition of hemp was incorrect, in light of my conclusion that cannabis with a delta-9 THC concentration that exceeds 0.3 percent post-decarboxylation is marijuana under the CSA. For the same reason, I do not view the Government's

characterization of the methodology's one percent total-THC threshold as inviting conviction on an improper basis, either.

Given these considerations, I am reassured that any misconduct here—and I am far from persuaded that there was any misconduct at all—was not severe and was otherwise adequately remedied by the jury's instructions. I am also satisfied that the evidence against Defendants was extensive in every direction and especially strong. Because any problems with the Government's closing arguments and rebuttal were not so great as to render the trial that the Defendants received unfair, I will not award them a new trial on those grounds.

## CONCLUSION

For the forgoing reasons, Defendants' Motion for Judgment of Acquittal (ECF No. 713) and Motion for New Trial (ECF No. 714) are both DENIED.

SO ORDERED.

Dated this 10th day of March, 2026.

/S/ Lance E. Walker
Chief U.S. District Judge